593 A.2d 266

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. PHILLIP DIXON, DEFENDANT–APPELLANT.

Argued November 5, 1990—Decided July 25, 1991.

226

*Paul M. Klein,* Deputy Public Defender II, and *Marcia Blum,* Assistant Deputy Public Defender, argued the cause for appellant (*Wilfredo Caraballo,* Public Defender, attorney; *Paul M. Klein, Marcia Blum,* and *Claudia Van Wyk,* Deputy Public Defender II, on the briefs).

*Chana Barron,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

In this capital case the State does not disagree that the death sentence must be vacated. Point XIII of the State's brief summarizes the point:

Defendant contends that the trial court's charge during the penalty phase with respect to the jury's consideration of mitigating factors was erroneous in that it required the jury to unanimously find an alleged mitigating factor before it could be considered. The State is constrained to agree that the court's charge with respect to the need for juror unanimity before finding the existence of a mitigating factor violates the principles subsequently enunciated in *Mills v. Maryland,* 486 *U.S.* 367 [108 *S.Ct.* 1860], 100 *L.Ed.*2d 384 (1988), and *State v. Bey* II, 112 *N.J.* 123, 159–60 [548 *A.2d* 887] (1988). [Footnote omitted.]

Acknowledging that defendant's death sentence with respect to the underlying murder must, therefore, be vacated, the State seeks to have us remand the matter for a new capital-sentencing proceeding unless the Court determines that the murder conviction does not establish death eligibility. In that circumstance, the State asks that the conviction of non-capital murder be affirmed and the case be remanded for resentencing on the murder count to a term of imprisonment, which for murder is between thirty years and life with a minimum of thirty years

without possibility of parole. *N.J.S.A.* 2C:11–3b. Defendant, in addition to challenging the death sentence on the grounds that the trial court's charge required juror unanimity with respect to the mitigating factors, asserts numerous challenges to the underlying convictions of murder and the related offenses. We find that the conviction for murder did not establish death eligibility, but affirm that conviction in all other respects. Pursuant to the State's election so to proceed, we therefore remand the cause for imposition of the non-capital murder sentence.

## I

The case arises from the brutal murder of a thirteen-year-old girl as she walked home from school. To her last moment, she fought against her stronger assailant. The marks she left on his body and the telltale presence of fibers drawn from his clothing, along with eyewitness testimony of fellow students, sealed the case against her assailant, defendant, Phillip Dixon.

As the young girl, Tanya, walked home from school on Friday afternoon, February 22, 1985, several of her fellow students saw defendant "on top of" her in an area of underbrush along a path between the children's school and homes. (The area was in the Borough of Woodlynne, although the children attended Camden High School.) Although at first the other students thought that there might have been nothing more than an innocent encounter between the two, their suspicions deepened when Tanya did not soon arrive home. The children alerted Tanya's mother of the fact that they had seen Tanya with defendant, an eighteen-year-old fellow student at the high school. Her mother went to defendant's house in search of Tanya, but he was not home.

The police were informed of the missing child. An intensive search disclosed her body approximately one hundred yards from the place of the sighting by the students. Her partially-nude body had been dragged through the underbrush into a

creek. Her body was lodged in the water underneath a car seat and other discarded refuse. Only a foot was showing above the surface of the water.

After his encounter with the victim, defendant went to his cousin's home, where he changed his clothes. He claimed that he had been in a fight and called his brother to bring the change of clothes. Later that afternoon, defendant returned home, where his mother told him that the victim's mother had been there asking about Tanya. Defendant again changed his clothes, and that evening went with his brother to Philadelphia. Later that night he went to his grandmother's home in Hempstead, Long Island. Having been informed by the school children that Tanya had last been seen with defendant, the police put out an all-points alert for him. They soon learned that he was in Hempstead at his grandmother's home. The Woodlynne police called the Hempstead police, who arrested defendant on Sunday afternoon, February 24, 1985.

Defendant gave an oral confession to the Hempstead police. A Hempstead officer summarized defendant's statement as follows: On Friday afternoon defendant was walking with his mother to a local bank. He remembered that he needed money to see a movie later, so he returned home to get some money. While returning, he was walking along a path and saw a young girl. He decided to take her pocketbook. He chased her, grabbed her, and forced her down to the ground in a "weeded [sic] area," at which point she was screaming and struggling. She eventually flipped onto her stomach and he straddled her with his knees. But she screamed as he tried to take her pocketbook. She looked at him and said "I know you, I've seen you." As she continued to scream, he reached for "a spike or a nail" lying on the ground and hit her on the head with it. Defendant did not know why he struck the girl and could not remember the amount of pressure he used or whether the nail had penetrated the girl's head. He said that the girl had been screaming "like in the movie '10 to Midnight.' " When the officer said that he had not seen the movie, defendant said, "[I]t

was like in that movie when the girl in the movie kept scream-
ing and she wouldn't stop screaming and the guy stabbed her."

A grand jury indicted defendant for the murder of Tanya as
well as for a variety of other offenses, including robbery,
aggravated criminal sexual contact, hindering apprehension (by
concealing her body, destroying evidence, and fleeing), and
various other offenses.

At trial, the State produced the school children who had seen
defendant with Tanya, on top of her, apparently engaged in a
scuffle. They recalled that he wore a camouflage jacket.
Another witness described seeing defendant drag Tanya into
the woods towards the water. A fiber expert described the
fibers found on her body as being identified with defendant's
cap. A sneaker imprint was found at the scene that matched
the Nike sneakers seized at defendant's cousin's home. A
pathologist said that the victim had been struck by a pointed
object, that the blow to Tanya's head had pierced her brain, and
that death was inevitable from the blow, although she was
probably alive when her body was submerged under the water.
Two scenes or segments from the movie "10 to Midnight" were
shown in which a perpetrator in dissimilar circumstances was
stabbing a screaming young woman.

Defendant took the stand on his own behalf. He denied that
he had committed the murder, asserting that he had never
given the alleged confession and that on the date of the crime
he had been wearing a blue Army jacket and red suede Puma
sneakers. The Hempstead police officer who had interrogated
him testified that defendant had told him that he had been
wearing those clothes on Friday afternoon.

The jury convicted defendant of most of the counts but not
the robbery count. At the sentencing proceeding, the State
charged two aggravating factors: that the murder had involved
torture, aggravated battery, or depravity; and that the murder
had been committed to avoid apprehension. The jury unani-
mously found only two mitigating factors and imposed a sen-

tence of death. Defendant appeals to us as of right under *Rule* 2:2–1(a)(3).

## II

### *Pretrial Issues*

### A. Composition of Grand and Petit Juries

Defendant contends that the Camden County jury-selection system violated his rights to a jury drawn from a fair cross-section of the community and to equal protection of law, and also violated his statutory right to a randomly-drawn representative jury, in violation of the provisions of *N.J.S.A.* 2A:70 and :71.

### 1. *The Constitutional Issues*

In evaluating the constitutional challenge, we briefly review the principles set forth in *State v. Ramseur*, 106 *N.J.* 123, 215–38, 524 *A.*2d 188 (1987). Without restating the principles in detail, we may summarize by stating that under the constitutional guarantees, selection of both grand and petit juries must be free from any taint of discriminatory purpose and the jurors must be drawn from pools that represent a "fair cross-section of the community."

To prove either an equal-protection or a fair-cross-section claim, defendant must (1) identify a constitutionally-cognizable group, that is, a group capable of being singled out for discriminatory treatment; (2) prove substantial underrepresentation over a significant period of time; and (3) show discriminatory purpose either by the strength of his statistical showing or by showing the use of racially non-neutral selection procedures to support the inference of discrimination raised by substantial underrepresentation. *State v. Ramseur, supra,* 106 *N.J.* at 215–16, 524 *A.*2d 188.

In sum, we primarily focus on the cognizability of the group in question, the substantiality of the underrepresentation, and the possible causes of it.

For purposes of this appeal, we shall accept that the assertedly underrepresented minorities (Blacks, Hispanics, and Puerto Ricans) would meet the first prong of the test. We shall also accept, for purposes of this appeal, the statistics set forth in defendant's brief with respect to the representation of those minorities. The data are as follows:

UNDERREPRESENTATION OF MINORITIES
Camden County

| GROUP | DATA | | STANDARDS OF REPRESENTATIVENESS | | |
|---|---|---|---|---|---|
| | Pop'n. (%) | Qual. Pool (%) | Absolute (%) | Comparative (%) | Stat. Sign. (sd) |
| Blacks | 13.37 | 9.57 | 3.8 | 28.42 | 2.27 |
| Hispanics | 3.27 | .93 | 2.34 | 71.56 | 2.59 |
| Puerto Ricans | 2.65 | .47 | 2.18 | 82.26 | 3.28 |

In *Ramseur* we explained the meaning of those various standards of representativeness. 106 *N.J.* at 219–27, 524 *A.*2d 188. We shall not repeat them here except in the simplest terms. Absolute disparity measures the difference between the proportion of the subject group in the general population and its proportion to the jury pool, that is, the qualified list. Comparative disparity builds on that figure by using the absolute-disparity figure and constructing a ratio to measure the magnitude of the disparity given the difference in population size. For example, a four-percent absolute disparity in a fifty-percent population represents an eight-percent comparative disparity, whereas that same four-percent absolute disparity in a population of eight percent is a fifty-percent comparative disparity. The comparative-disparity standard is more likely to register underrepresentation of smaller groups. The smaller the group, the more significant is any deviation. The third approach, the statistical significance test, measures the likelihood that aspects of the selection process do not operate randomly. That test is an entirely statistical analysis in which the statistician assumes

absolute neutrality in the selection process and measures the statistical likelihood of deviation from the expected. In *Ramseur*, we gave the following example. The jury-selection process in which two groups are being compared can be likened to filling a box with a population of one thousand slips of paper of which six hundred are pink and four hundred are grey, and having someone randomly select a sample of one hundred slips. The expected number of pink slips would be sixty and the expected number of grey slips would be forty. That is, in any drawing there would be a sixty percent probability of drawing a pink slip and a forty percent probability of selecting a grey one. However, a statistician would not be surprised if the number of pink slips deviated from the expected. Statisticians measure that deviation by a formula that enables them to tell whether the result is so far from the expected as to demonstrate the result was not random or by chance. A complex mathematical formula determines that standard deviation. For example, in the case of the one-hundred-slip sample, a statistician expects that the standard deviation would be plus or minus 4.8 slips. (Calculations omitted, *see Ramseur, supra,* 106 *N.J.* at 221 n. 44, 524 *A.*2d 188.) If the result of a drawing were to yield only thirty pink slips, that would be approximately six standard deviations (6 × 4.8) away from the expected. A statistician assumes that a result more than two or three standard deviations from the expected would be suspect.

In this case the statistics submitted with respect to underrepresentation of minorities are not disturbing except with respect to the comparative disparity of Hispanics and Puerto Ricans. As we noted in *Ramseur,* "if these cases [dealing with underrepresentation of groups] have a common thread, it is that a comparative disparity well over fifty percent is strong evidence of underrepresentation cognizable under the sixth and fourteenth amendments." 106 *N.J.* at 220, 524 *A.*2d 188 (quoting *State v. Lopez,* 107 *Idaho* 726, 733, 692 *P.*2d 370, 377 (Ct.App. 1984)).

With respect to the comparative disparity concerning under-representation of Hispanics and Puerto Ricans, we are satisfied that that does not demonstrate a constitutional underrepresentation because of the very small percentage of the population pool thereby represented. A comparative disparity of about fifty percent may or may not be adequate to show such under-representation, depending in part on the size of the group in question. *State v. Lopez, supra,* 107 *Idaho* at 733, 692 *P.*2d at 377. The absolute disparity becomes magnified when converted to a measurement of comparative disparity because of the smallness of the sample used.

The statistical-significance test confirms the inefficacy of the comparative-disparity figure. In the case of Hispanics and Puerto Ricans, the statistical significance of the discrepancy is very close to the two or three standard deviations from the expected and thus is not constitutionally suspect.

But even were those numbers themselves to straddle the borderline of substantial underrepresentation, we would look to the circumstances surrounding the statistical showing to determine its full constitutional import. Generally speaking, when jury-selection systems have been found to be constitutionally underrepresentative on the basis of statistical showings of underrepresentation, objective selection criteria such as voting registration and drivers' licenses, as were used in this case, are not present. *See State v. Ramseur, supra,* 106 *N.J.* at 225, 524 *A.*2d 188. In addition, courts have looked at the time period over which violations are alleged. That inquiry goes to the existence of a history of exclusion. In this case, as in *Ramseur,* we have evidence based on only one survey of 500 jurors from a 1984 mailing. Not only does the survey fail to cover a significant period of time, but reforms were apparently made to the system the following year, rendering the data and resulting conclusions at least partly outdated.

Given the borderline nature of the disparities shown, we do not find inadequacies that rise to constitutional dimension.

## 2. *The Statutory Issues*

N.J.S.A. 2A:70-4 requires the assignment judge of a county to merge the lists of registered voters and holders of motor vehicle licenses to compile a single list from which all jurors shall be selected.

Defendant makes specific objections that he asserts demonstrate such a deviation from established statutory requirements that the indictment must be dismissed. For purposes of this appeal we shall accept defendant's version of the record. (The State will be free in any collateral proceedings to dispute these assertions.)

(1) Elimination of Zip Codes. In the mailing of questionnaires before the spring of 1985, seven or eight zip codes were eliminated from the drivers' license lists. The population within Camden County for those zip codes represented over one-fifth of the whole county population. The various jury-selection officials agreed that most of the zip codes were eliminated because they embraced areas that fell partially outside of Camden County.

(2) Failure to Eliminate Duplicates. This is the "match-merge" problem that we described in *State v. Gerald*, 113 *N.J.* 40, 130–31, 549 *A.*2d 792 (1988). The computers fail to recognize that some people use different names on voting or driver lists, resulting in two "Jones" at the same address.

(3) History File Exclusion. Once a juror in Camden has been excused for one reason or another, the name is put in a "history file." Often a juror who may be disqualified at one time (as for pregnancy) could be later qualified, but insufficient attention was paid to the "history file" to restore names to the eligible list. The result, claims defendant, is that as many as two-thirds of the eligible jurors are in that category of ineligibility.

(4) Inactive–Voter File. The inactive-voter file was used to cull names from the jury list, but the fact that one does not vote does not mean that one is not eligible to serve as a juror. Although there may be some who are removed from voting lists

because they have died or moved, there was an insufficient explanation of why that practice should be followed, especially in the case of persons whose names appeared on the motor-vehicle lists.

(5) High No–Response Rate. Defendant points to inaction by the jury commissioners in the face of a persistently high no-response rate of up to 32.8%. That means that 32% of the people to whom questionnaires had been sent simply failed to return them or otherwise to show why they should be included or excluded from the juror lists. A court directive requires that a no-response rate above 15% be reported to the assignment judge.

(6) Improper Disqualification. Defendant claims that the non-retention of the received questionnaires of disqualified jurors made it impossible to resolve conflicting testimony regarding (1) medical disabilities regularly allowed without documentation; (2) exemptions for care of minor children; (3) exclusion of students who were county residents; and (4) exclusion of teachers even during summer months. That was described by defendant as making it very easy for county residents to avoid jury service and compounds the other defects set forth in his brief.

In *State v. Ramseur, supra,* 106 *N.J.* 123, 524 *A.*2d 188, we considered whether discrepancies in statutory or administrative directives with respect to jury selection necessitated the dismissal of an indictment. We repeat what we said there: "We do not construe our state's statute as requiring dismissal of the indictment whenever the statutory commands are breached, regardless of the nature or effect of the violations or the intent of those who committed them." *Id.* at 231–32, 524 *A.*2d 188. The judicial power to dismiss an indictment is not to be exercised except on the clearest and plainest grounds, and an indictment should stand unless manifestly deficient or palpably defective. *State v. Wein,* 80 *N.J.* 491, 501, 404 *A.*2d 302 (1979); *State v. Weleck,* 10 *N.J.* 355, 364, 91 *A.*2d 751 (1952). We said

that violations of our jury-selection regulations should warrant a dismissal of an indictment only "where they substantially undermine the randomness and objectivity of the selection mechanism or cause harm to the defendant." *State v. Ramseur, supra,* 106 *N.J.* at 232, 524 *A.*2d 188.

With respect to the selection of petit juries, we recognize that in some circumstances the special fundamental role played by the petit jury in our system of criminal justice may call for reversal of the conviction because of improper selection procedures, even in the absence of a showing of prejudice. *State v. Kociolek,* 23 *N.J.* 400, 406, 129 *A.*2d 417 (1957); *State v. Wagner,* 180 *N.J.Super.* 564, 567, 435 *A.*2d 1190 (App.Div.1981). In *Kociolek,* the trial court had employed one of its regular criminal panels, contrary to a statute requiring the special drawing of a forty-eight-member panel prior to trial for murder. A majority of the Court agreed that that violation alone would have required reversal, even absent a showing of actual prejudice. The Court described the statutory requirement as "a course of procedure so imperative in expression as to bar waiver by the defendant or his counsel where the indictment is for treason or murder." 23 *N.J.* at 406–07, 129 *A.*2d 417.

*State v. Wagner, supra,* involved an even more blatant violation of the statutory provisions governing the selection of petit juries that required jurors' names to be "[d]rawn from the box, one at a time." 180 *N.J.Super.* at 567, 435 *A.*2d 1190 (quoting *N.J.S.A.* 2A:74–1). The trial court simply seated the first fourteen jurors to enter the courtroom and replaced excused jurors by calling on other jurors seated in various rows by "going right down the row." *Id.* at 566, 435 *A.*2d 1190. Those are such plain and blatant violations of law that they cannot be condoned.

But what we have here are inefficiencies rather than invidiousness. There is no suggestion whatsoever that any of the failings were in any way intended to undermine the randomness of the jury-selection process. Underrepresentation is not de-

fined by comparing the representation that "would have occurred randomly" with the actual representation of the group on the jury. Rather, "underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors." *Castaneda v. Partida*, 430 *U.S.* 482, 494, 97 *S.Ct.* 1272, 1280, 51 *L.Ed.*2d 498, 510 (1977). In addition, although defendant is indeed entitled to have his challenge based on the array and not the individual panel chosen, we note simply that of the twelve-person panel actually chosen for the trial and penalty phases, two of the five men were black and two of the seven women were black. Of the four alternates, all women, one was black.

Although the procedures used obviously implicated the randomness of the selection process, there is no showing that they substantially undermined the randomness principle. When, as here, the purpose of the official's action was not impermissibly to exclude members of a cognizable group, the asserted statutory violations do not call for a dismissal of the indictment or a reversal of the conviction. Defendant interprets the opinion of the court below as not calling for a correction or improvement in the noted deficiencies, but we are certain that the motion judge who now sits as the assignment judge intended his opinion to have that effect. When he said that the "Camden County Selection Process had to be corrected," but that the "deviations from the New Jersey Jury Selection Statutes directives do not rise to a level constituting grounds for relief," we are certain he intended that changes be made.

In sum, although the noted deficiencies may be considered somewhat more than merely technical, here, as in *State v. Long*, 119 *N.J.* 439, 469, 575 *A.*2d 435 (1990), and *State v. Gerald*, *supra*, 113 *N.J.* at 131, 549 *A.*2d 792, there was no evidence that the grand- and petit-jury panels, as composed, were not representative of the community, nor was there any suggestion that the independence of the grand or petit jury had been compromised. None of these practices reduced a minority's representation to "impotence" or "restrict[ed] unreason-

ably the possibility that the petit jury will comprise a representative cross-section of the community." *State v. Gilmore,* 103 *N.J.* 508, 529, 511 *A.*2d 1150 (1986). The methods used were in no sense an attempt to undermine or inject invidious discrimination into randomness. The goal was an objectively random list that reached substantially all eligible sectors of the juror pool.

### B. The Validity of the Confession

Defendant contends that he was not given full and effective warning of his constitutional right to remain silent as he was not informed that he had a continuing opportunity to exercise that right, and he was never told that he could terminate any interrogation. In addition, he contends that although he was not informed of his right to terminate questioning, the police had reason to believe he was attempting to exercise that right when, after having answered questions for a time and after having agreed to make a written statement, he refused to sign anything. The Hempstead police officers testified to a marked change in defendant's attitude following a telephone conversation with his grandmother, after which he was "not cooperative" and became "somewhat hostile." Defendant contends that his actions constituted assertion of his right to remain silent and, as part of their obligation scrupulously to honor defendant's fifth-amendment rights, the police should have made an effort to ascertain the significance of the distinct change in attitude. Defendant asserts also that he requested counsel at the station house, a request that would have prevented the police from questioning him before counsel was provided. That claim was not raised below and is part of a claim of ineffective assistance of counsel, which we discuss in Point III(F) hereof, *infra* at 259–262, 593 *A.*2d at 284–285.

When a suspect makes a statement that arguably amounts to an assertion of Miranda rights, and the interrogating agent recognizes that the statement is susceptible of that construction, police questioning concerning the crime should immediately cease and the officer then should inquire of the suspect

about the correct interpretation of the statement. *State v. Bey* II, *supra,* 112 *N.J.* at 136, 548 *A.*2d 887.

Each side presents a different version of the interrogation. As noted, on Sunday afternoon, February 24, 1985, Detective McLaughlin of the Nassau County police department was notified of a teletype from the Woodlynne, New Jersey, police department. The teletype indicated that there was a warrant for defendant's arrest and set forth a description of defendant and his probable location. Based on the information contained in the teletype, McLaughlin proceeded to the specified location.

When McLaughlin arrived at the apartment house, he found the front door open and other police officers already present. McLaughlin spoke privately with defendant's uncle, Robert Newbill, explaining that defendant was sought in connection with a homicide. Defendant surrendered to McLaughlin, who handcuffed him, informed Newbill that defendant was being taken to headquarters, and left the apartment with defendant. McLaughlin testified that he informed defendant of his rights while en route to the police station: that he had the right to remain silent, that anything he said could be used against him, that he had a right to an attorney, and that if he could not afford one, an attorney would be provided for him. At police headquarters, defendant was taken to an office in the basement. Detective Martin Alger of the Homicide Squad was notified. Newbill came to the police station. McLaughlin informed him that defendant was talking to homicide detectives. Newbill asked if he could see defendant and was told that he could not at that time. According to the police, Newbill made no mention of securing an attorney.

Detective Alger conducted the interrogation. He informed defendant of his rights from memory. He did not produce a card, and he concedes that he did not specifically inform defendant that he had a right to terminate questioning at any time. He asked defendant if he could speak with him without having an attorney present. Defendant agreed to speak to him. At

about 6:00 p.m., defendant provided the narrative of the offense that we set forth as summarized by a Hempstead police officer in our recital of the facts.

The trial court, after considering the totality of the circumstances, properly concluded that defendant's statements were voluntarily made after a knowing and intelligent waiver of his constitutional rights and were not the product of interrogation that resulted in the overbearing of defendant's will. See *State v. Bey* II, *supra*, 112 *N.J.* at 134–35, 548 *A.*2d 887 (State must establish the voluntariness of the confession beyond a reasonable doubt).

Defendant maintains that when his demeanor changed following the conversation with his grandmother, the officers should have made an effort to ascertain the significance of the distinct change in his attitude instead of simply ignoring that change and continuing their interrogation. The police testified that defendant became "very tense, very agitated," and that he refused to write anything. It is not reasonable to construe defendant's behavior as a cutoff of questioning. Here defendant was twice informed of his rights. Included in those warnings was the information that if defendant spoke with the detectives, anything he said could be used against him. Defendant knew that he had been arrested for homicide. That he was not specifically informed that he was subject to the death penalty does not disqualify the confession. Defendant was not a juvenile whose age is relevant to a voluntariness determination. Nor was it fatal that he was not told in so many words that he had the right to terminate questioning at any time, although obviously it is preferable that such a warning be specifically stated. It is the substance of the warning, however, that counts. *Duckworth v. Eagan*, 492 *U.S.* 195, 109 *S.Ct.* 2875, 106 *L.Ed.*2d 166 (1989); *State v. Melvin*, 65 *N.J.* 1, 13–14, 319 *A.*2d 450 (1974). Defendant was plainly told that he had the right to remain silent and not to incriminate himself.

## C. Voir Dire

Defendant contends that the jury *voir dire* in this case was so inadequate that he was denied his right to a fair trial by an impartial jury. In addition, defendant contends that the court's preliminary *voir dire* instructions informed the jurors of what they needed to say in order to avoid sitting in this case.

Before prospective jurors were questioned, they were required to complete questionnaires that provided the court with information about their personal lives or their familiarity with defendant, counsel, or witnesses; their ability to consider impartially the evidence presented; and their general ability to serve as jurors.

Defendant contends that by instructing the jurors how they would become disqualified, the court created a danger that some of the potential jurors would feign an excusable position on the death penalty in order to avoid serving on this capital jury. He objects in particular to a portion of the preliminary *voir dire* in which the court summarized the *Adams–Witt* test:

> You are disqualified only if your view is so broad and firmly held that you will not be able to follow my instructions as to the law at the close of the trial. In short, your views concerning the death penalty may disqualify you only if they would prevent or substantially impair your ability to decide this case fairly and impartially based on the evidence presented to you in this courtroom, and in accordance with the law which the court will instruct you.

See *Wainwright v. Witt*, 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985), and *Adams v. Texas*, 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980).

Defendant argues that in *State v. Williams* II, 113 *N.J.* 393, 550 *A.*2d 1172 (1988), the trial court gave the potential jurors virtually the identical preliminary *voir dire* instruction as provided in this case and the Court emphatically disapproved. We stated there that an instruction that effectively tells the juror what answers could lead to automatic excusal and what responses would avoid excusal "unwisely put the potential juror in the position of determining whether he or she met the legal requirements to serve on a jury." *Id.* at 412, 550 *A.*2d 1172.

Defendant contends that of the sixty-three prospective jurors who were questioned about their death-penalty attitudes, nine were excused "due to their scruples against execution," claiming that they "said what the court told them it had to hear for them to be excused due to their death-penalty views."

In addition, defendant asserts that the overall quality of the *voir dire* was insufficient to enable counsel to exercise their peremptory challenges, suggesting that the responses to the generalized questions of the court resulted in virtually no information that would distinguish one prospective juror from another. Defendant asserts that because the court did not ask open-ended follow-up questions, it was impossible for the court below, and it remains impossible for this Court, to recognize the differences in the opinions of the separate jurors. Specifically, not one of them was asked whether the sexual assault and murder of a teenage girl would be a circumstance that would influence the juror concerning the imposition of the death penalty.

In short, defendant contends that there was no "thorough and searching inquiry" by the trial court into each individual's attitude concerning the death penalty and that the jurors were inadequately screened concerning publicity about the case. See *Williams* II, *supra*, 113 *N.J.* at 413, 550 *A.*2d 1172 (death qualification process in capital-murder prosecution requires "thorough and searching" inquiry into "jurors' opinions and biases").

Our independent review of the *voir dire* reveals that as a whole the *voir dire* was sufficiently probing in its attempt to weed out any prospective jurors who indicated through their answers that the facts of this case might impair their ability to decide defendant's guilt or innocence or to determine the proper sentence.

Again we note that this *voir dire*, like others that we have seen, acquired a rhythm of its own, as the jurors' attitudes became more apparent to court and counsel. There is one

quality to this *voir dire* that differs from others: it displayed much more limited participation by counsel in the *voir dire* process. As is often the case, the trial court conducted almost all of the questioning. In *State v. Moore*, 122 *N.J.* 420, 585 *A.*2d 864 (1991), we reviewed various *voir dire* methods and explained the processes that we believe best produce death-qualified jurors, particularly encouraging judges to be open to the suggestions of counsel. *Id.* at 455–56, 585 *A.*2d 864 (citing *State v. Long, supra,* 119 *N.J.* 439, 575 *A.*2d 435).

We believe, however, that the process here enabled counsel to select a fair and impartial jury. Jury selection took place over a six-day period. The court employed the "struck-jury system" in which it qualified approximately fifty prospective jurors, thus allowing each side to exercise peremptory challenges from a qualified pool. The first step in the process was a general orientation given to each day's panel. In that orientation the court described the nature of the case, the age of the victim, the charges against defendant, and the two-step process in capital cases.

At the time of this trial, the United States Supreme Court had recently decided *Wainwright v. Witt, supra,* 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841. In that case, the Court directed that the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424, 105 *S.Ct.* at 852, 83 *L.Ed.*2d at 851–52. The trial court here gave the jurors a brief summary of that ruling, now objected to by defendant. However, the court had made it clear to the jurors that "I've described our effort in a very general fashion, because it will assist you in understanding our inquiry with respect to your views concerning the imposition of the death penalty."

Following that general orientation, the jurors were excused to complete a questionnaire before returning to the courtroom for *voir dire*. That questionnaire is set forth in the appendix to defendant's brief and asks a number of specific questions of the jurors. When the jurors had been returned individually to the courtroom, the court's pattern was to review each of the questions in summary fashion with the juror and to question the jurors with respect to any problematic answers on the questionnaire. In its general orientation, the court had made it clear to the jurors that there are "no right or wrong answers" to the questions. It was, as he said, an attempt to obtain qualified jurors.

In the course of interrogating each juror, the court encouraged candor and frankness, expressing these types of sentiments to the jurors: "Tell me straight out * * *. Tell me like it is"; "I'm looking for honest, frank and candid answers"; that he would like it "straight from the shoulder"; and in the case of a disqualified juror who had expressed some reservations about the presumption of innocence, "I compliment you for being candid with me."

The trial court did not employ a rigid slot-defining format such as that described in *State v. Williams* II, *supra,* 113 *N.J.* at 414, 550 *A.*2d 1172 (automatic life, automatic death, all others), but very often asked a completely open-ended question of jurors focusing on whether they had any attitudes or opinions at all concerning the imposition of the death penalty. It did not attempt to force the jurors into any mode.

The court's rulings with respect to the qualifications of jurors were even-handed. The court denied a prosecution attempt to disqualify for cause a juror who, having once been a defendant himself, had voted in a prior jury service to acquit; excused for cause a juror who expressed a view that he might be "swayed by ages"; let sit a juror who said he would have voted against capital punishment in a referendum; removed a juror who expressed "doubt" about the presumption of innocence; worked

hard to calm down a somewhat distraught juror who felt overcome by the complexity of the proceedings and qualified that rather straight-talking person to sit on the jury.

Granted that specific questions related to the facts of this case might have elicited more responsive answers from the jurors, it does not appear that any jurors hesitated to inform the court of any reservations they had on account of the age or characteristics of the victim. One said that his four-and-one-half-year-old child would, in fact, affect his judgment, and that person was excused from jury service. In the process of the *voir dire,* court and counsel agreed that the simplest approach to reinterrogation of a juror was to ask the juror briefly to leave the courtroom and then have the court confer with counsel about further questions. On one occasion when the prosecution asked for further inquiry from a prospective juror, who was a lawyer, the court stated, "I'll chat with her." In short, there is every indication that the court would have been receptive to questions from counsel. This counsel, like counsel in *State v. Marshall,* 123 *N.J.* 1, 586 *A.*2d 85 (1991), neither sought nor believed in an exhaustive *voir dire* process, seeming to wish that the court not overemphasize the qualification process. Prosecution and defense counsel rarely asked for follow-up questions. When they did, the court invariably acceded. The struck-jury panel ran the gamut of professions and occupations, including a farmer, an unemployed person, a school-bus driver, and three lawyers, one of whom had been a clerk for a United States Supreme Court Justice. As we note in the jury-selection discussion, the jury that was finally selected consisted of eight whites and four blacks, five men and seven women.

Hence, we conclude that the questioning was sufficiently calculated to produce a fair and unbiased jury. Several of the jurors questioned did state that they had heard about this case or read about it. Any of those who had preconceived notions of guilt were excused. Most said they could remember only bare details and would wait to hear the evidence in the courtroom.

It seems to us that most jurors approached the case in a quite fair-minded way. We are satisfied that the information furnished to counsel and the impressions drawn with respect to each of the jurors as they presented themselves enabled counsel to select a fair and impartial jury.

## III

### *Trial Issues*

#### A. Use of the movie, "10 to Midnight"

■ At trial, the State sought to introduce into evidence portions of the film "10 to Midnight." The relevancy proffered by the State was related to the statement attributed to defendant by the Hempstead police officers that the killing was "like in the movie '10 to Midnight.'" That film has been described in a review as a "police and murder thriller" and a "propaganda piece that argues against laws that let brutal slayers escape with insanity pleas." N.Y. Times, Mar. 13, 1983, § 1, at 62, col. 5.

The record includes the two clips from the film that were admitted into evidence. The trial court viewed the film with counsel and concluded that those two clips, which involved stabbings of women, might aid the jury in three respects: (1) to establish what defendant was talking about or what he meant by the reference; (2) by demonstrating that there was indeed such a movie, which would give credibility to the officers' accounts; and, finally, (3) to establish the motive that defendant had stabbed the victim because she was screaming.

The court relied, in its preliminary ruling, on *Evidence Rule* 7(f), the keystone of the *Rules of Evidence*, which provides that unless evidence is specifically excluded elsewhere, it is admissible if relevant. Relevant evidence is defined as evidence "having any tendency in reason to prove any material fact." *Evid.R.* 1(2).

Defense counsel objected to the admission of the evidence on the basis that it was not relevant, and that even if it were relevant, it should be excluded under *Evidence Rule* 4, which allows courts to exclude evidence if it finds that its probative value is substantially outweighed by the risk that its admission will create substantial danger of undue prejudice or of confusing the issues or misleading the jury.

The court ruled that the evidence was admissible. When the clips were shown, the court told the jury that the evidence "may aid or assist you in corroborating or believing whether the defendant ever made reference to [the movie '10 to Midnight']," and may "give you some flavor as to what he had in mind."

Obviously in some cases there might be a marginal relevance between an extrinsic reference in a statement and a material fact at issue in a trial. Probably the most notable example is the case of John Hinckley, in which Hinckley's defense psychiatrist proffered that he had been influenced by the movie "Taxi Driver" to attempt to assassinate President Reagan in order to ingratiate himself with a woman. See L. Caplan, *The Insanity Defense in the Trial of John W. Hinckley, Jr.*, 77 (1984). Another such incident occurred in the Charles Manson trial in which his bizarre interpretation of the Beatle song "Helter Skelter" may have contributed to the overall motivation for his conduct. *People v. Manson*, 61 *Cal.App.*3d 102, 132 *Cal.Rptr.* 265, 278 (1976), *cert. denied*, 430 *U.S.* 986, 97 *S.Ct.* 1686, 52 *L.Ed.*2d 382 (1977). The problematic use of such an evidentiary device, at least by the State, is compounded in a capital case by the bifurcated nature of the proceedings. Any relevance that type of evidence might have in the guilt phase of a capital trial would be so overwhelmed by prejudice in the sentencing phase by extraneous factors irrelevant to capital sentencing that the admission of such evidence would almost inevitably require reversal of a death sentence. *See State v. Williams* II, *supra*, 113 *N.J.* at 451, 550 *A.*2d 1172 (jury may not base death sentence on considerations that are constitutionally impermissi-

ble or totally irrelevant to the sentencing process); *State v. Rose*, 112 *N.J.* 454, 548 *A.*2d 1058 (1988) (admission of repetitive and highly-inflammatory evidence of defendant's past conduct without careful and precise limiting instruction compelled reversal of death sentence).

For even if the jury is instructed, as here, to use the portions of the film shown only for purposes of establishing (1) that defendant used those words, and (2) what he had in mind when he was making the reference, there is no realistic way for the jury to separate the voyeuristic aspects of the film from the evidentiary purpose. The character referred to in the movie is a psychopathic serial killer who repeatedly engages in sadistic killings of young women. He and his victims are depicted in the nude. The final message of the film is that the only way to protect society from such people is for the Charles Bronson-type character to shoot them to death lest the law afford them some defense.

Given the structured nature of capital sentencing, we have repeatedly emphasized that juries are not to be subjected to extraneous factors that may influence a jury's verdict in a way neither contemplated nor authorized by statute. The subliminal message of the film here surely tainted the penalty phase. With respect to the guilt phase of the trial, however, given that the two most objectionable inferences cited by defendant, "what is he like," "how can we protect society from this type," have so little relevance to the guilt-phase issues, we find that the potential for prejudice from the film clips is so slight as not to warrant a reversal. The background evidence (the reference to the movie) was of such marginal significance that it was not even in the written notes of the Hempstead police officer who took down the statement. Its anecdotal value is peripheral to the State's case.

We might be inclined to reverse the guilt convictions if this were a case of less-than-overwhelming evidence of guilt. *See Carter v. Rafferty*, 621 *F.Supp.* 533 (D.N.J.1985) (introduction

of evidence of racial animus into case was so potentially prejudicial that it affected outcome of case), *aff'd*, 826 *F.*2d 1299 (3d Cir.1987), *cert. denied*, 484 *U.S.* 1011, 108 *S.Ct.* 711, 98 *L.Ed.*2d 661 (1988). It is the very marginality of the evidence that establishes the lack of prejudice. We find it inconceivable that this evidence would have swayed a jury from the essential facts of the case and the overwhelming evidence of guilt—multiple disinterested eyewitnesses, physical evidence in the form of shoeprints, fibers, and blood, and, finally, the confession of defendant.

B. The Gerald Issue. Does the jury's
verdict establish death eligibility?

Although we have often visited this issue, there has been a persistent misapprehension that in the process we are second-guessing juries about the jury's findings of intent. The public obviously does not understand what we are doing. Even lawyers who comment on our opinions seem to confuse the question of the court's role with that of the jury. Hence, we repeat again the basics.

We regret carrying pre-Code terminology forward into the discussion, but there may be no other way to get the interested readers to understand the issue. Under pre-Code law, no person could be sentenced to death without a jury finding of first-degree murder. At common law, prior to the adoption of the Code of Criminal Justice, there were two forms of murder: first-degree murder and second-degree murder. Only the former subjected a defendant to the death sentence. First-degree murder was characterized by the concept of "deliberate and premeditated" murder. Second-degree murder constituted essentially all other murders and was characterized by the presence of "malice aforethought," which could be inferred by a jury from the actor's infliction of serious bodily injury on a victim. When the new Code of Criminal Justice was enacted, there was no need to distinguish between first- and second-degree murder. The sentence for each was the same. *L.* 1979,

*c.* 178 (thirty years' imprisonment). The Code included both forms of murder in its general definition of murder. *N.J.S.A.* 2C:11–3 (criminal homicide constitutes murder when the actor "purposely" or "knowingly" causes death or serious bodily injury resulting in death).

As we explained, however, in *State v. Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792, when the death penalty was superimposed on the Code of Criminal Justice in 1982, no specific reference was made to which of the two forms of murder would be death eligible. However, the legislative history of the Act and constitutional concerns convinced the Court that it was only the intentional killing that was to be subject to death eligibility. As the sponsor of the bill stated, using the familiar forms known to common-law lawyers in New Jersey, a defendant faces death-penalty proceedings only after having been "found guilty unanimously and beyond a reasonable doubt of first degree murder, willful, premeditated murder." *Capital Punishment Act: Hearings on S. 112 Before the Senate Judiciary Committee* at 1 (1982), *quoted in State v. Gerald, supra,* 113 *N.J.* at 90, 549 *A.*2d 792. Any other interpretation would present a possible constitutional problem.

Hence, we ruled that part of a capital trial must be the determination by a jury whether defendant had committed what the Code now refers to as "knowing or purposeful murder" (capital/first-degree murder). If required by the evidence, a jury must consider in the alternative whether defendant purposefully or knowingly caused death, or purposefully or knowingly caused serious bodily injury that resulted in death (SBI/second-degree murder), only the former rendering the defendant death eligible. *Id.* at 69, 549 *A.*2d 792.

The misunderstanding that has arisen over our application of the *Gerald* doctrine stems from confusing the question of apparent guilt with the question of how guilt is to be decided. The question that has been asked about our review of capital cases is how it can be that one who had repeatedly stabbed a

victim, *State v. Jackson,* 118 *N.J.* 484, 572 *A.*2d 607 (1990), or one who had bludgeoned a victim, *State v. Harvey,* 121 *N.J.* 407, 581 *A.*2d 483 (1990), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991), or even one who had shot a victim, *State v. Pennington,* 119 *N.J.* 547, 575 *A.*2d 816 (1990) and *State v. Clausell,* 121 *N.J.* 298, 580 *A.*2d 221 (1990), can be thought not to have intended the death of the victim. The question answers itself. But the problem is not with the question; the problem is with who gets to answer the question. Under our system of justice only a jury that knows the difference between the two forms of murder and the question that it must decide may answer that question.

As appellate judges, our job is to ask: did the jury, with proper instructions, answer the question that establishes death eligibility? It seems plain to us in this case that the jury did not. We intend no criticism of court or counsel when we note that in this case the jury was specifically instructed that it could find defendant guilty of murder if it found that he intended to inflict on the victim serious bodily injuries that resulted in death. The court instructed the jury that "criminal homicide constitutes murder when the actor knowingly causes death or serious bodily injury resulting in death." After defining "knowingly," the court explained:

> In other words, if, for example, a person shot the victim only with a purpose to cause serious bodily harm but death does, in fact, occur, you may find that the accused knew that what he did would, as a matter of practical certainty, result in death. Then he is guilty of murder as if he shot the victim with a conscious object of killing.

This charge plainly embraced SBI or what used to be called second-degree murder.

Although legal charges are at the core of a fair trial, one could consider attempting to rehabilitate the verdict were it not that the SBI/second-degree charge played a prominent part in the State's prosecution. For although a strong case can be made that points unerringly to an intent to kill based on the deliberate submersion of the victim's body, in his closing remarks to the jury, the prosecutor, quite understandably, direct-

ed the jury's attention to the earlier stabbing as the basis for murder. Recall that in his confession defendant said that he did not know if Tanya were alive or dead. Thus, the prosecutor said to the jury:

> Obviously, ladies and gentlemen, people don't go around saying I'm going to commit a knowing murder. They don't do that. Instead what do they do? They commit the murder. And you can infer from the acts of the individual himself circumstantially what it was that that individual intended to do. So that you can deduce or you can figure out from the way someone kills somebody that they intended to or that they knew that when they did it it would cause serious bodily injury resulting in death or death itself.

The State thus presented the jury with at least two plausible bases for the conviction, the intentional infliction of serious bodily injury resulting in death (SBI/second-degree) or the intentional killing by drowning (capital/first-degree). The court's charge to the jury did not inform it that only the latter form of murder was death eligible. When a jury verdict can rest on one of two available bases, no court can presume which basis it is. *Bollenbach v. United States*, 326 *U.S.* 607, 613, 66 *S.Ct.* 402, 405, 90 *L.Ed.* 350, 355 (1946). The error was not harmless because there was evidence in this case that could have sustained an SBI/second-degree murder verdict. We do not suggest that such a verdict was likely, but merely that if the jury returned that verdict, the court could not reject it.

Insistence on that fundamental requirement of jury findings in the face of overwhelming evidence of guilt may appear to some to be too great a price to pay by a society beset by rising crime. But there is an enduring value to the principle that only juries can decide our guilt or innocence. If people had to choose the liberties they would give up, we think that the right to have a jury determine their guilt would be among the last surrendered. It is that right that we are enforcing. We are not second-guessing juries. Juries, properly instructed, not judges, decide whether the murder is capital or non-capital. This jury was not instructed that it had to make that distinct determination. There can be no substitute for that jury verdict.

### C. Was it error not to have charged a felony murder based on attempted sexual assault?

 Defendant was charged with capital murder, aggravated criminal sexual contact, robbery, and felony murder with robbery as the predicate felony. According to defendant, the gist of the State's case was that defendant had tried to rob and sexually attack his victim and during the commission of those crimes he killed her. The jury acquitted defendant of robbery and felony murder in the course of robbery. During deliberations, the jury asked whether they could find defendant guilty of felony murder based on a felony other than robbery. The court responded that robbery is "the only felony that you address your attentions to." Defendant contends that the evidence warranted instruction on felony murder with attempted sexual assault as the predicate felony. A conviction of felony murder, as opposed to capital murder, would not render defendant eligible for the death sentence.

The difference between aggravated criminal sexual contact and attempted sexual assault is that the former is proved by showing an unauthorized "touching," *N.J.S.A.* 2C:14–1d, whereas the latter requires proof of an attempt of "an act of sexual penetration." *N.J.S.A.* 2C:14–2c. In the context of a felonious sexual crime, felony murder can be based only on a felony involving penetration or attempted penetration. *N.J.S.A.* 2C:11–3a(3). Defendant suggests that the record strongly indicates that he was attempting to commit the act of sexual penetration on the victim and that he stabbed the victim in an attempt to force her to submit to such an attack, but that the stabbing proved more serious than intended, causing death. In sum, defendant says that this was an attempted sexual assault requiring submission of a felony-murder charge.

Of course we agree that "the court ordinarily has a supervening responsibility to charge the jury concerning any version of the offense 'clearly indicated' by the evidence to require proper jury consideration." *State v. Grunow,* 102 *N.J.* 133, 148, 506 *A.*2d 708 (1986) (quoting *State v. Choice,* 98 *N.J.* 295, 299, 486

*A*.2d 833 (1985)). But the trouble with the analysis in a case like this, in which defendant did not request such a charge, is that it puts the court in an impossible position. Defendant was not charged with sexual penetration or attempted sexual penetration. What if the jury had convicted defendant of intentional murder and then had premised a sentence of death on an attempted sexual penetration, viewed as an aggravating factor? We could well envision that if the court on its own motion had submitted that felony to the jury and the jury had not only found attempted sexual penetration but predicated a death sentence on it, what a troublesome issue it would be to review on appeal. *See State v. Zola,* 112 *N.J.* 384, 548 *A*.2d 1022 (1988) (Handler, J., concurring and dissenting) (proof of sexual penetration was not sufficient to have been submitted to the jury as aggravating factor in capital-murder case), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989).

In *State v. Choice, supra,* 98 *N.J.* at 299, 486 *A*.2d 833, we emphasized that a trial court has no obligation to charge the jury on a particular offense when not requested by the parties unless the facts "clearly indicate" the appropriateness of the charge. In a capital case a court cannot lightly submit to a jury an uncharged predicate felony that may result in the imposition of a sentence of death. In any event, this matter arises as plain error. To be reversible error it must have been capable of bringing about an unjust result. Defendant asserts only that the basis for reversal is that it "would have given the jury the option of convicting defendant of a non-capital murder." Because the sentence for felony murder is the same as the sentence for knowing or purposeful murder where the death penalty is not imposed, there is no prejudice to defendant in the circumstances of this case.

> D. Was it error to have submitted the crime of
> aggravated criminal sexual contact based on
> the presence of a deadly weapon?

The indictment charged only the commission of aggravated criminal sexual contact based on the commission of a

robbery. The interrelated provisions of the sexual-offense provisions of the Code of Criminal Justice, *N.J.S.A.* 2C:14–1 to –8, set forth a variety of factors that determine the degree of criminal culpability in different settings. We give but a shorthand summary of the provisions. Among the factors to be considered are the nature of the act, *e.g.*, whether it involved penetration or other contact; the relationship between the parties; and age differentials. Recall that in this case the victim was found partially unclothed and that defendant was charged not with penetration but with sexual contact of the victim.

Criminal sexual contact is elevated for grading and sentencing if it is done during the commission of another crime or involves the use of a weapon. In this case the indictment charged defendant with aggravated sexual contact based on the commission of a robbery.

At the close of the State's case, defendant moved for an acquittal on all counts. The court questioned the factual basis for the aggravated criminal sexual contact in that the language of the indictment failed to specify whether it occurred during the course of the robbery or while defendant was armed. The court consulted with counsel, reviewed pretrial proceedings, and noted that the prosecutor's pretrial representation to defendant was that the sexual contact had been committed during "either the course of the commission of the robbery or the possession of the weapon." The State argues that, having found no prejudice to defendant from lack of notice, the court properly concluded that there was sufficient evidence to support an aggravated criminal sexual contact charge based on either the robbery or the fact that defendant was armed.

We agree with the State's position on that issue. As a general rule a criminal defendant may not be convicted for an offense not charged in the indictment, but a trial court may instruct a jury on lesser-included offenses of the crime charged in the indictment on the prosecutor's request when there is a

rational basis for the charge and when the defendant consents. *State v. Sloane*, 217 *N.J.Super.* 417, 423, 526 *A.*2d 226 (App. Div.1987), *rev'd on other grounds*, 111 *N.J.* 293, 544 *A.*2d 826 (1988). Because the indictment fairly apprised defendant of the charge (after all, the offense is the sexual contact, the other factors grade it) and the pretrial discovery revealed that the State's theory was based on either the possession of the weapon or the robbery, giving sufficient notice to defendant to defend against the charge, there is no constitutional infirmity. *See State v. Talley*, 94 *N.J.* 385, 466 *A.*2d 78 (1983).

 E. Did comments made by the prosecutor deprive
 defendant of his right to a fair trial?

Defendant contends that his right to a fair trial was violated by comments made by the prosecutor during the proceedings. Specifically, defendant asserts that it was highly improper for the prosecutor to speculate that young witnesses were testifying as though they themselves feared they might have been defendant's victim; to describe defendant as a "big man" among "lesser thugs," referring to a statement made by defendant at the Hempstead police station; to use dehumanizing and degrading epithets about defendant as being a cold person who had "a lack of feeling, a lack of any remorse, a complete lack of concern about his own predicament"; to suggest that defendant had an obligation to prove that his picture had been in the paper when defense counsel cross-examined witnesses about whether their eyewitness accounts had been influenced by the picture; to speculate that there was blood from defendant under the victim's fingernails; to suggest to the jury that it conduct its own scientific experimentation without adequate evidentiary guidelines; and, finally, that the prosecutor undermined defendant's right to be present at his own trial by commenting on the fact that he had sat in the courtroom and "he knows what they've all said to you and he knows how his story's got to add up."

We are satisfied that those asserted improprieties were not of such a nature as to deprive defendant of a fair trial. Although generally limited to commenting on the evidence and to drawing any reasonable inferences supported by the proofs, a prosecutor may nonetheless make "a vigorous and forceful presentation of the State's case." *State v. Bucanis*, 26 *N.J.* 45, 56, 138 *A.*2d 739, *cert. denied*, 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958). In each of the instances cited the prosecutor's comments were sufficiently related to the scope of the evidence before the jury. Although the blood under the victim's fingernails could not be identified as defendant's blood, there were scratches and other marks on defendant's face that could warrant an inference that the blood had come from defendant. The reference to defendant as a "big man" among "thugs" also had some tangential reference to the evidence offered that defendant explained to the other inmates in the Hempstead lockup that he was going to the head of the line because he had committed a murder. The comments with respect to defendant's demeanor on testimony, taken in their entirety, did not suggest that defendant had any burden to disprove the State's case. The State suggests that the comments about defendant's presence in the courtroom at least nominally addressed the credibility of defendant's comments when he could not explain inconsistencies in the differing accounts. Finally, the suggestion that the jury itself examine the fibers did not bolster any expert's testimony in any way but was more or less a suggestion of a common-sense observation by the jurors that could not have misled the jury.

### F. Ineffective assistance of counsel

In a recent series of capital cases, we have set forth the standards for determining whether a capital defendant has received the effective assistance of counsel at both phases of a trial. *State v. Oglesby*, 122 *N.J.* 522, 585 *A.*2d 916 (1991) (Handler, J., concurring); *State v. Savage*, 120 *N.J.* 594, 577 *A.*2d 455 (1990); *State v. Davis*, 116 *N.J.* 341, 561 *A.*2d 1082 (1989). Suffice it to state that capital cases present issues of

extraordinary complexity, and to be considered reasonably competent capital counsel obviously requires a very broad grasp of principles of both capital jurisprudence and constitutional criminal procedure.

We will state the issue as defendant presents it. This case was characterized by a change of counsel in the course of trial. At the inception of the proceedings, defendant was represented by attorneys from the Camden County Public Defender's office. In addition to filing motions challenging the jury arrays in Camden County and the constitutionality of the death penalty, original counsel obtained experts to assist them in challenging the jury-selection system. Defense counsel also sought to question the sufficiency of the evidence supporting aggravating factor c(4)(c) (battery/torture/depravity), and to require the prosecutor to state the specific facts on which he relied in asserting aggravating factors.

In appellate counsel's view, the most crucial challenges for the defense to meet and successfully defend against were defendant's alleged confessions and the eyewitness testimony of several children. Defense counsel prepared pretrial challenges to the admissibility of the confessions and the reliability of the identifications. However, shortly before trial was to begin, defendant's family obtained the services of a private attorney, who was not admitted to practice in New Jersey, but was substituted as counsel for defendant four weeks before the trial commenced. This was his first capital case in New Jersey.

Defendant has asserted a variety of challenges to the effectiveness of his retained counsel. Among them are his ineffectiveness during the jury *voir dire*, a point that we have discussed in part II(C) hereof, an issue primarily related, however, to death qualification, an issue mooted by our disposition of this case. As we noted in that discussion, defense counsel took a very low profile in the conduct of the jury *voir dire*. We need not debate whether that was tactical. We are satisfied it did not interfere with the selection of an impartial jury.

Several of the allegations of ineffective assistance of counsel during the guilt phase of the trial cannot, however, be resolved on this record. Most of the objections we consider to be tactical in nature, for example, that defense counsel failed to make opening statements on behalf of his client in either the guilt or penalty phases.[1] At least one aspect, however, will require further consideration in post-conviction relief proceedings, namely, whether defendant's failure to call two witnesses at the *Miranda* hearing was the product of a strategic decision. We noted in *State v. Davis, supra,* 116 *N.J.* at 357, 561 *A.*2d 1082, that matters of tactics and strategy are virtually unassailable when they are based on a proper understanding of the law and evaluation of all the facts in a case. In this case, one of the most damaging pieces of evidence against defendant was his confession. Before trial counsel was substituted to represent defendant, the Public Defender's office was preparing for a lengthy *Miranda* hearing, anticipating producing witnesses to testify in defendant's behalf, specifically defendant's uncle, Robert Newbill, and his grandmother, Thelma Dixon. Those witnesses were going to be called to testify to the circumstances surrounding defendant's arrest in New York. Newbill would testify that defendant told the police in his presence that he (defendant) would not speak without a lawyer present. That information was given to defendant's new defense team, whose members allegedly never bothered to interview the witnesses. At the *Miranda* hearing, the witnesses were not called.

Had defendant invoked the right to counsel, then all further police questioning would have had to cease in the absence of his initiating further interrogation. That issue was raised in a motion for a new trial, but the record is inadequate to disclose what reasons of tactics and strategy motivated counsel not to

---

[1]Appellate counsel also questions trial counsel's failure to object on discovery grounds to the admission of the movie, "10 to Midnight." Because we consider the evidence not to have been unduly prejudicial, this failure would not, in itself, be grounds for reversing the conviction.

call the witnesses. He might have thought they were unreliable. He concentrated his *Miranda* challenge on the unlikelihood that the police would have failed to obtain written *Miranda* waivers if the warnings were given. In *State v. Savage, supra,* 120 *N.J.* 594, 577 *A.*2d 455, a similar trial-counsel failure—failure even to consider a psychiatric defense—necessitated a post-trial hearing at which trial counsel explained his rationale for the decision. The Court found that rationale totally unacceptable. It failed to demonstrate minimal competence; it was not a strategic decision, but a total lack of a decision. ʿDefendant suggests that permissible trial strategy can never include the failure to conduct a substantial investigation into any of defendant's plausible lines of defense.

We find this record inadequate to evaluate the ineffective-assistance-of-counsel issue with respect to the confession. A post-conviction relief proceeding will have to address that issue. *See State v. Savage, supra,* 120 *N.J.* at 609–12, 577 *A.*2d 455 (at post-trial hearing, trial court considered factors that went into decision not to assert mental disease or defect in defense); *United States v. Schaflander,* 743 *F.*2d 714 (9th Cir.1984) (court reviewed allegations of ineffective assistance of counsel in post-conviction relief proceeding), *cert. denied,* 470 *U.S.* 1058, 105 *S.Ct.* 1772, 84 *L.Ed.*2d 832 (1985). Those proceedings must determine whether the non-production of witnesses was the result of tactics or of neglect and, if the latter, whether it prejudiced defendant. At that proceeding, counsel should also address defense counsel's failure to cross-examine the State's forensic expert on the fiber samples. Even if it were neglect, however, the possibility of any prejudice on that account seems most unlikely. Finally, there has been no showing that a *Wade* hearing could in any way have aided defendant.

G. Were the non-capital sentences excessive?

 Dixon was convicted in counts five, six, and nine of hindering his own apprehension for murder by hiding the victim's body in a nearby creek, by washing the clothing he

wore at the time of the murder, and by leaving the state. The court imposed three consecutive maximum sentences of five years, two and one-half without parole, on each hindering conviction, for a total of fifteen years, seven and one-half without parole.

Defendant contends that imposition of the maximum term with the maximum period of parole ineligibility on each count is excessive, as is imposition of three consecutive terms. He asserts that the sentences violate the specific standards enunciated by this Court in *State v. Yarbough*, 100 *N.J.* 627, 498 *A.*2d 1239 (1985), *cert. denied*, 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986), to guide courts in the fashioning of consecutive sentences.

Because the matter must be remanded for resentencing on the murder count, we defer resolution of those sentencing issues until reconsideration of the entire sentence, including the murder count. *See State v. Moore*, 113 *N.J.* 239, 310, 550 *A.*2d 117 (1988) (leaving sentences to discretion of trial court following disposition of murder count). We note, however, that this case does not fit within the exception to *State v. Yarbough, supra*, 100 *N.J.* at 647, 498 *A.*2d 1239: "[E]ven within the general parameters that we have announced there are cases so extreme and so extraordinary that deviation from the guidelines may be called for." In *State v. Moore, supra*, the defendant committed an incredibly bestial cult killing in which the murdered victim had been beaten, tortured, subjected to sexual abuse, cuffed to a hook on the kitchen wall, chained to a bathtub at night, and was neither clothed nor fed. A case such as that occasions departure from the *Yarbough* guidelines. *See also State v. Louis*, 117 *N.J.* 250, 566 *A.*2d 511 (1989) (even in rare cases justifying departure from "two longest" rule, other *Yarbough* guidelines remain relevant). The State suggests that the three counts need not merge and we agree with that conclusion. Each offense required proof of a different fact. However, the fact that the three offenses do not merge does not mean that the principles of *Yarbough* do not apply.

### H. Other sentencing-phase issues

In view of the disposition that we make, we are not required to resolve other sentencing-phase issues raised by defendant. In particular, defendant argues that submission to the jury of the c(4)(f) aggravating factor (killing to escape detection) was precluded because in pretrial proceedings the State had specifically relied upon the robbery as the underlying predicate offense for charging this factor. Although the prosecutor emphasized in his closing arguments that the basis for the jury's finding of this factor could be the sexual-contact conviction, in its charge to the jury the trial court did not specify a basis for submitting the c(4)(f) factor. Either basis raises the serious concerns noted by Justice Handler's dissent. Trial fairness is "a categorical imperative" for death-penalty prosecutions. *State v. Williams*, 93 *N.J.* 39, 61, 459 *A.*2d 641 (1983). No one can face capital sentencing without adequate notice of the charges against him or her. *See Lankford v. Idaho*, —— *U.S.* ——, 111 *S.Ct.* 1723, 114 *L.Ed.*2d 173 (1991) (vacating court-imposed death sentence when State has not given notice that it would seek death penalty).

If the jury based its finding of the killing-to-avoid-detection factor on the basis of the sexual contact, there is a serious due-process issue. On the other hand, if the jury based its finding of this factor on the previously specified offense of robbery, defendant would seek to assert a double-jeopardy violation because the jury had acquitted defendant of the underlying robbery. The State argues that the obvious basis was the sexual-contact offense and that because defendant knew from the prosecutor's remarks that that was the basis for submission of the factor, there is no lack of notice and no due-process violation. We need not resolve the issue in this case, but we caution courts concerning the need to observe *Lankford*'s admonitions about fair notice in presenting capital cases to the sentencing jury.

## IV

To sum up, the right to trial by jury includes the right to have a jury decide the essential elements of an offense. This jury was not instructed to decide which of the two forms of murder defendant had committed. That finding is necessary to determine death eligibility. The error was not harmless because there was evidence in this case that would have sustained an SBI/second-degree murder verdict. A court can no more dispense with the fundamental right of trial by jury in a capital case than in any other case.

The death sentence is vacated and the matter remanded to the Law Division for sentencing on the murder conviction in accordance with this opinion.

HANDLER, J., dissenting in part and concurring in part.

The Court reverses defendant's capital murder conviction and death sentence. It sustains, however, defendant's conviction for non-capital murder and remands the matter for the imposition of sentence based on that murder conviction. In my opinion, the trial errors in this case call for the reversal of all the convictions. The most serious of these errors relate to the inadequacy of the *voir dire;* the admission of highly prejudicial evidence that had minimal probative worth; the refusal to accord defendant a hearing on the sufficiency of the evidence relating to all the aggravating factors proffered by the State; and the reliance on an aggravating factor with respect to which the State had not given any prior notice. In addition, I continue to believe that the many infirmities of the capital-punishment statute persist and also require that defendant's convictions be reversed. *See, e.g., State v. Marshall,* 123 *N.J.* 1, 214–16, 586 *A.*2d 85 (1991) (Handler, J., dissenting); *State v. Di Frisco,* 118 *N.J.* 253, 284, 571 *A.*2d 914 (1990) (Handler, J., concurring in part and dissenting in part). I therefore dissent in part and concur in part.

## I.

The *voir dire* in this case was so inadequate as to deprive defendant of his federal and state constitutional rights to a fair and impartial jury. As part of the *voir dire*, the trial court gave an instruction prior to the distribution of jury questionnaires that each potential juror was required to complete. The instruction included the advice that jurors would be disqualified if they were unable to "follow [the court's] instructions as to the law at the close of the case."

Virtually the identical instruction was given by the court in *State v. Williams*, 113 *N.J.* 393, 550 *A.*2d 1172 (1988) (*Williams* II). There the Court expressed strong disapproval of that preliminary instruction, concluding that "it effectively tells a juror what answers during the death qualification process lead to automatic excusal and what responses avoid excusal." *Id.* at 412, 550 *A.*2d 1172. In *State v. Hunt*, 115 *N.J.* 330, 352, 558 *A.*2d 1259 (1989), this Court reiterated its disapproval of an instruction that signals the way a prospective juror can be excused. More recently, the Court admonished the trial court on remand to avoid language that would "specify the views that would disqualify a prospective juror." *State v. Clausell*, 121 *N.J.* 298, 321, 580 *A.*2d 221 (1990).

In my opinion, the trial court's preliminary instruction indicated precisely the kind of answer that would automatically trigger disqualification. Following that instruction, sixty-three jurors were questioned on their attitudes towards the death penalty; eleven were excused for cause. Reflecting the court's preliminary instruction concerning disqualification, nine of those eleven indicated that their opposition to the death penalty prevented them from fairly applying the law, one indicated that he would always vote to execute a defendant convicted of murder, and one felt her feelings about capital punishment prevented her from being impartial. The possibility is too strong that the court's explanation to the jury of the critical and ultimate test for juror qualification became a precise di-

rection for disqualification. The unfairness to this capital defendant that eleven jurors concocted excusable positions is unacceptable.

Other serious inadequacies surrounded the *voir dire*. During individual questioning, the trial court consistently followed a particular pattern in the death qualification process. First, the court would ask each juror if he or she had an opinion on the death penalty. If the juror responded that capital punishment was appropriate in certain circumstances, the court then asked highly leading questions, usually couched in absolutes, that called for "yes" or "no" responses. Typically, the court would ask whether the juror felt that some crimes deserved the death penalty; then it would ask whether the juror would vote for death in all cases where a defendant was found guilty of murder; finally, the court would ask one or two questions about whether jurors could make findings on guilt without considering punishment. Each of those questions could be answered either "yes" or "no," without elucidation.

The Court has disapproved strongly of closed-ended questions that predetermine answers or elicit narrow yes/no responses. *Williams* II, *supra*, 113 *N.J.* at 418–423, 550 *A.*2d 1172. The evil in that practice is its failure to reveal underlying biases. That shortcoming was more pronounced because, in many instances, the questioning was very superficial and wholly insufficient to uncover jurors' underlying views concerning the death penalty, let alone to identify prospective jurors with misconceptions about the law.

One need look only at the pattern of questioning of impaneled jurors to get a sense of the pervasiveness of that inadequate questioning. Juror Judith Colon stated that she was both "for and against [the death penalty], [d]epending on the situation." No clarification of that statement was elicited beyond a few highly-leading questions. Juror Matt Dranchak's opinion on the death penalty was that "there should be one in existence and it should be treated for the stature of the crime, not apply

it across the board, I believe the nature of the crime is the important thing." No clarification of that point was attempted. Juror Dorothy Balkman expressed confusion after claiming to have no opinion on the death penalty, then gave conflicting responses on whether she would ever vote to impose it. When asked if she could never vote for death when guilt was found, she replied, "I could never, I couldn't say I could never say never." The court ascertained that what she meant was "I could never say never." After receiving facially-correct responses to several more closed-ended questions, the court qualified that juror. When asked about the death penalty, alternate juror Jane Fisher felt that "each case is different, I think, some cases, it is, it should be done." Other than a few leading questions, no further probing of that largely meaningless response was conducted. Questioning of juror Gerald Yost followed that same pattern. After stating that he was "not against" the death penalty "in certain cases," he supplied the ostensibly correct "yes" and "no" responses to satisfy the court. Juror Helen Briglia could vote for death depending on "the way the murder was committed." Follow-up inquiry consisted of standard questions the responses to which were unenlightening. Juror Marie Eckert told the court: "I don't like the death penalty." Yet she stated that she could vote for it if warranted. Probing did not extend beyond the same, simplistic questions. The questioning and ultimate qualification of juror Charles Cannon followed the same pattern.

Alternate juror Robin Cream told the court that she "would prefer not to be in the position to have to judge either way" on the death penalty. The judge discounted her views, stating: "But then everything we do in life is not always what we prefer to do." He then asked her the standard questions and qualified her when she gave the correct responses. Juror Helen Kozak felt the death penalty is "fair in some cases and not fair in others. I think it depends on the circumstances." When she confused guilt-stage considerations with penalty-phase considerations, the court distinguished them for her. Otherwise, the

standard yes/no questions were unalterably asked. In deciding whether to vote for death, juror Harvey Hurst would consider "the nature of the crime;" all further death qualification followed the same catechistic pattern adhered to by the court. After initially offering no opinion on the death penalty, juror Gladys Campbell revealed that she would vote for death if the defendant "deserves it;" the court did not try to amplify that answer, merely resorting to its standard pattern of questioning. Juror Constance Gillard also initially expressed no opinion of the death penalty, then stated that she would have to hear "all the facts and then I would judge based on the facts." The court's consistent pattern of questioning followed. Those examples strongly indicate that death-qualification was shallow and yielded little information on jurors' views on the death penalty.

Nor did the questioning of most jurors provide meaningful information on when jurors would vote to impose death. Thus, the trial court did not effectively determine whether a prospective juror would vote automatically to impose the death penalty in a sexual assault and murder of a thirteen-year-old girl. The significance of the omission of such questioning is highlighted by the questioning of Barbara Venditti, who had two teenage daughters, one of whom was thirteen. The examination of Venditti on her ability to be impartial was limited to closed-ended questions, following her preliminary uncertainty over whether the fact that "the alleged victim in this case is thirteen" would "in any way interfere with [her] ability to be absolutely fair and impartial":

A: I don't know.

Q: Well, that's why I'm asking you, I want you to think about it. You see, when we ask you whether or not you would presume the defendant to be innocent, you indicated you would. Now, that's very important. Do you understand that?

A: Yes.

Q: And you have to be absolutely fair and impartial.

A: Yes.

Q: Now, the fact that the victim in the case is thirteen, would that in any way prevent you from being fair and impartial?

A: No.

The court then told the juror that charges do not constitute guilt and described the State's burden of proof, following which the juror indicated that the age of the victim would not prevent her from being impartial. At least six jurors were excused because they had relatives close in age to that of the victim. Others were excused citing the age of the victim and the nature of the crime (not indicating whether they had family members close in age to that of the victim). However, even though several jurors volunteered to the court that they could not be fair because of the age of the victim and the nature of the crime, the court did not consistently ask prospective jurors about those vitally important considerations. One jury member, Harvey Hurst, and two alternates, Robin Cream and Jane Fisher, indicated that they had teenage children. None was questioned on his or her ability to be impartial. Those jurors may have been automatic death-penalty jurors when considering a sexual assault and murder of a young teenage girl. That possibility was not explored.

In *Williams* II, *supra*, 113 *N.J.* 393, 550 *A.*2d 1172, this Court found that similar deficiencies in the *voir dire* outweighed its effectiveness. Regarding automatic-death-penalty jurors (in that case, jurors who would automatically vote to impose the death penalty if the defendant had committed murder and rape), this Court observed that the trial court had asked all jurors if knowledge of the charges would in any way influence their decision concerning the imposition of the death penalty. That question alone was insufficient to identify automatic-death-penalty jurors. Further, the trial court had refused to allow defense counsel to pose additional questions that might provide insight into any juror's views on the subject. We concluded that those failures constituted "serious error." *Id.* at 417, 550 *A.*2d 1172. Thus, significant inquiry into juror

feelings, views, and attitudes on the death penalty was foreclosed by resort to closed-ended and leading questions.

Further, the record strongly suggests that in many instances the explanations by jurors of their thinking on the death penalty was colored by the court's own views. The trial court appears improperly and excessively to have influenced the content and tenor of jurors' responses. The court strongly controlled the *voir dire* examination. Its control, however, was exercised in a very domineering and intimidating manner. The trial court frequently and consistently would tell a juror that it did not want to put words in his or her mouth, and would seemingly seek assurances from the juror that opinions expressed were the juror's own. Yet, it appears that the court orchestrated its examination precisely to secure the opposite result—to elicit an answer that mirrored the court's own view implicit in its question. Its words were precatory, but its message was mandatory. In light of the persistent judicial proselytizing, it is simply not possible to conclude with any confidence that the court did not in fact put words in the mouths of jurors.

Many of the court's questions appear calculated to produce "correct" answers, and many of the jurors' responses seem spoonfed. For example, almost invariably when a prospective juror indicated that he or she had read about the case, the court would immediately ask the juror: "You don't believe everything you read in the newspaper, do you?" On receiving a "no" response, the court would then ask: "Isn't it a fact that what I told you this morning was in greater detail than what you read in the newspaper?" Simply because that sentence is punctuated with a question mark does not disguise what is clearly a declarative statement. In fact, that kind of pointed question seems more suggestive of adversarial cross-examination than of even-handed *voir dire*.

Furthermore, the statement itself is confusing. It purports to suggest a contrast between court-furnished information and

that derived from news accounts. It is hardly surprising that a juror would learn more about the case during an intensive orientation by the court than he or she would by reading a newspaper article. Thus, the court's "question" in purpose and effect importuned the jury to agree with the view implied in the statement, namely, that a newspaper or television account of the crime would necessarily be incomplete and inaccurate and that a juror need not be concerned about having been thus exposed to the crime. The critical problem raised by such exposure, however, is not addressed: whether pretrial or extra-trial publicity has left a juror with impressions that will compromise the juror's ability to deliberate fairly. See *State v. Biegenwald*, 106 *N.J.* 13, 524 *A.*2d 130 (1987). *Cf. Patton v. Yount*, 467 *U.S.* 1025, 1035, 104 *S.Ct.* 2885, 2890, 81 *L.Ed.*2d 847, 856 (1984) (for purposes of evaluating impact of pre-trial publicity, "relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant").

In sum, the appropriate and necessary inquiry is whether the juror had learned of any information that might prevent him or her from sitting as an impartial juror, not whether the court has explained the case in more detail than a news account. Thus, the mischief of the court's "question" is that it obscures totally the impression and attitude of jurors who may have been tainted by such publicity.

An impartial jury is essential to a fair trial. *Hunt, supra,* 115 *N.J.* at 348, 558 *A.*2d 1259; *Williams* II, *supra,* 113 *N.J.* at 409, 550 *A.*2d 1172. Taken in its totality the *voir dire* in this case falls far short of the probing and extensive, the fair and balanced, the neutral and objective questioning that is an essential predicate to securing a jury with the degree of impartiality and strong sense of fairness necessary in a capital prosecution. We have stressed repeatedly that the "requirement of fairness—and particularly jury impartiality—is heightened in cases in which the defendant faces death." *State v. Williams,* 93

N.J. *39, 61, 459* A.*2d 641 (1983)* (Williams *I*). Cf. Beck v. Alabama, *447* U.S. *625, 637–38, 100* S.Ct. *2382, 2389–90, 65* L.Ed.*2d 392, 403 (1980) (capital cases require heightened degree of reliability). To secure that end, we have mandated that trial courts undertake a comprehensive inquiry into a juror's attitude regarding the death penalty.* Williams *II*, supra, *113* N.J. at *413, 550* A.*2d 1172. Those principles were not followed in this case.*

## II.

Defendant contends that allowing the jury to watch excerpts of the film "10 to Midnight" constituted an abuse of the trial court's discretion and violated due process of law. The Court rejects that contention with respect to the guilt phase. *Ante* at 250, 593 *A.*2d at 279. I strongly disagree. The prejudicial repercussions inherent in that evidence were so severe that they completely undermine any confidence one might have in the result reached in the guilt phase. Defendant was irretrievably prejudiced by that evidence with respect to his criminal convictions.

Detectives McLaughlin and Alger testified at the *Miranda* hearing and at trial that defendant had confessed to the murder of Tanya Samuels. Detective McLaughlin stated that in his confession defendant compared the murder to the film "10 To Midnight." When McLaughlin expressed unfamiliarity with the film, defendant offered: "it was like the movie, like, you know, the girl kept screaming and the guy hit her ... he stabbed her." Detective Alger's recollection was slightly different. He testified that defendant had stated he did not know why he stabbed the victim but that "it was like in that movie when the girl in the movie kept screaming and she wouldn't stop and the guy stabbed her. He said it was like that."

Seizing on that remark, the State sought to introduce portions of "10 to Midnight" into evidence. Out of the presence of the jury, the prosecutor played the segments he wanted to

introduce, running the rest of the film at fast-forward speed. Subsequently, the court agreed that two murder scenes from the film depicted in those segments would be shown to the jury. The first shows a nude woman standing against a tree, slowly sliding to the ground and sobbing while a nude psychopathic murderer approaches her. As the murderer reaches for and touches her head, the woman slowly rises, pleading "Warren, don't hurt me. Warren, I'll do anything for you." The murderer plunges the knife into her. As the knife enters, the woman screams. The second murder scene portrays an apartment where a number of nurses reside. A woman cowers in a corner, shrieking and whimpering as the nude murderer, blood dripping from him, yells at her. The scene switches to a second woman hiding in a darkened adjoining room. When the camera returns to the first setting, the murderer's body obscures the now-silent victim. The murderer moves aside, revealing the victim's dead, bloody body.

Defense counsel strenuously objected to the admission of the film segments, stressing that "the request is somewhat outrageous.... What we have here is one of those sick mad slasher movies, we've got a man running around with no clothes on, obviously some kind of sexual pervert." However, without even hearing from the prosecutor, the court rejected defense counsel's objections. It found that defendant's reference to the "10 to Midnight" movie relevant to his state of mind and that the film segments were relevant to the credibility of the police officers' testimony concerning defendant's reference to the film as well as to defendant's motive for stabbing the victim. The trial court ruled that "where motive is so highly relevant no evidence should be excluded, [Evidence] Rule 4 should never be used."

Immediately prior to the jurors' viewing of the film, defense counsel restated his objections. He argued that if the film was to be shown to demonstrate defendant's state of mind, only the second scene was applicable. The court ruled that both scenes could be relevant. The court then gave the jury a limiting

instruction in which it stressed that the film would be shown only to help the jury decide whether the film existed and, if so, whether it related to defendant's state of mind. The jury then viewed both film segments.

One can hardly claim that the film clips were necessary to establish the existence of the film mentioned by defendant in his confession. No one disputed the existence of such a film. Although it is true that the detectives might have been lying about defendant's confession and implicitly about his reference to the film, viewing the film was hardly necessary to enable the jurors to assess the detectives' credibility. If the detectives were lying about defendant's confession in general, they could have been lying about his reference to the film regardless of the existence of the film. The fact that there was such a film simply has no bearing on whether the detectives were telling the truth.

The trial court's finding of relevance hinges for the most part on its state-of-mind theory. The only evidence of defendant's state of mind is that contained in the reference to the movie made in the course of his confession. That reference, however, mentions *only* the screaming of the victim. In contrast, the film segments encompassed highly potent evidence that went measurably beyond the circumstance of a victim screaming. Together the scenes graphically, vividly, and dramatically portrayed multiple sexually-driven murders committed by a cruel, perverted or psychopathic killer. Thus, the scenes depicted an extraordinarily savage, unremorseful, and dangerous killer: they show a murderer who kills often, who kills not simply because his victims are screaming, who kills while in the throes of some twisted sexual perversion, who kills out of cruelty or sadism, who kills because of some special rage or hatred toward his victims.

For instance, in the first scene the murderer and the victim know one another—she calls him by name; the victim is *not* screaming; she whimpers pathetically and pleads for mercy.

The murderer approaches that victim deliberatively, calculatedly, without remorse, and attacks her with obvious homicidal premeditation. His killing has nothing to do with her screams, which occur only as she is stabbed. In the second scene shown to the jury, the *same* murderer is seen; hence it is obvious that the murderer had already stabbed at least one other woman. Moreover, even within the second segment, it is evident that he has already killed other people because he is covered with blood before he cruelly kills his helpless, pleading victim. Further, he appears angered and frustrated, apparently because he was looking unsuccessfully for another woman, who is shown cowering in a hiding place. Thus, even though defendant's confession indicated at most that the murder he committed focused on the screaming of his victim, the two scenes shown to the jury depicted a murderer with an egregious homicidal state of mind that is in no way described or suggested by the defendant in his confession.

The State acknowledges that the clips "portrayed crimes clearly distinguishable in surrounding circumstances from defendant's murder of [Tanya Samuels]." The State nonetheless contends that the prejudicial impact of the film clips was minimal because the excerpts shown totaled only one minute and thirteen seconds. Regardless, the horror packed into those short scenes generates a devastating impact; the horror is more intense because the scenes are concentrated.

The State also argues that if any prejudice did result, it was offset by the court's instruction on the limited purpose of the film, namely, "to demonstrate that the film existed and to shed some light on defendant's conduct and what he meant by his reference to the film." The trial court apparently believed that the film segments contained no spill-over evidence beyond that confined to a victim who is killed only because she is screaming. Incredibly, the trial court stated that "[w]ith respect to ... [a] sex maniac running about, of course, that's not going to be shown to the jury." Yet, it is clear beyond argument that the

two film segments viewed by the jury did show graphically and precisely "a sex maniac running about."

*Evidence Rule* 4 governs the exclusion of prejudicial or misleading evidence. Comment 1 on that Rule states that the balancing of probative value and prejudice is left to the discretion of the trial court. *See State v. Carter*, 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982). On appeal, the party seeking exclusion must show that "the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted." *Ibid.* (citing *State v. Rogers*, 19 *N.J.* 218, 229, 116 *A.*2d 37 (1955); *Evid.R.* 4, Comment 2. Evidence of motive is admissible even if it will potentially inflame a jury. *Ibid.* (citing 1 Wharton, Criminal Evidence, § 170 at 316 (13th ed. 1972)). Yet, inflammatory evidence must be excluded if probative, non-inflammatory evidence on the same point is available. *State v. Davis*, 116 *N.J.* 341, 366, 561 *A.*2d 1082 (1989).

This Court has considered the prejudicial impact of photographs introduced in the guilt phase of capital cases on several occasions. *See, e.g., State v. (Samuel) Moore*, 122 *N.J.* 420, 466–69, 585 *A.*2d 864 (1991); *State v. Savage*, 120 *N.J.* 594, 632–33, 577 *A.*2d 455 (1990); *State v. McDougald*, 120 *N.J.* 523, 579–83, 577 *A.*2d 419 (1990); *State v. Rose*, 112 *N.J.* 454, 535–36, 548 *A.*2d 1058 (1988). In those cases the photographs depicted the actual crime scenes and/or victims. The photographs related to the identity of the corpse and/or the time and manner of the murders. With the exception of *Rose*, in those cases this Court found that although some of the pictures may have been inflammatory, the defendant did not establish a palpable abuse of discretion. By contrast, in *Rose*, this Court determined that the trial court should have excluded an autopsy photograph depicting the site of a bullet entry wound because the photograph was highly inflammatory and the site of the entry wound had already been established by another photograph. However, in light of the overwhelming evidence of the defendant's guilt, the Court found the erroneous admission harmless. 112

*N.J.* at 546, 548 *A.*2d 1058. The Court reached a similar result with respect to the admission of the victim's blood-stained shirt and undershirt, which had been introduced to show the distance between the defendant and the victim when the latter was shot. This Court found that the court should have excluded the evidence, but that failure to have done so was harmless error. *Ibid.*

The evidence at issue here is qualitatively different from that in *Rose.* As prejudicial as were the photographs and blood-stained shirts in *Rose,* they at least constituted physical evidence that bore some relation to the circumstances of the crime. Here, the trial court admitted evidence only remotely connected to the circumstances of the criminal investigation, which carried with it a cavalcade of devastatingly prejudicial images, suggestions, and associations.

Further, showing a film to a jury is qualitatively different from showing it still photographs. With respect to the use of films at trial, the Appellate Division has noted that there "is danger of undue prejudice as a result of the jury's placing inordinate weight on the moving pictures ... in light of the tremendous dramatic impact of motion pictures." *Balian v. General Motors,* 121 *N.J.Super.* 118, 128, 296 *A.*2d 317 (1972) (citing Paradis, *The Celluloid Witness,* 37 *U.Colo.L.Rev.* 235 (1965)), *certif. denied,* 62 *N.J.* 195, 299 *A.*2d 729 (1973). Here, the visually riveting nature of "10 to Midnight" underscores that the film's "predominant effect [was] to arouse the emotions of the jury without contributing enlightenment on the issues at hand." *State v. Bucanis,* 26 *N.J.* 45, 52, 138 *A.*2d 739, *cert. denied* 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958) (citation omitted).

The trial court's *Evidence Rule* 4 determination presents a palpable abuse of discretion. Defendant's reference to "10 to Midnight" was vague and fleeting. It generates only the inference that he killed Tanya to quiet her. Yet, the court exposed the jury to scenes of a naked psychopath brutally

stabbing defenseless women. Thus, allowing the jury to conjure up images from that film in considering defendant's culpability appears to be the *most* inflammatory way to demonstrate defendant's state of mind. *See State v. Davis, supra,* 116 *N.J.* at 366, 561 *A.*2d 1082 ("even relevant evidence of an inflammatory nature may not be admitted under *Evid.R.* 4, regardless of the availability of limiting instruction, if probative, non-inflammatory evidence on the same point is available") (citation omitted). Although a jury is presumed to follow the court's instructions, *see State v. Manley,* 54 *N.J.* 259, 255 *A.*2d 193 (1969), that presumption is surely dispelled when the evidence is minimal and its inflammatory · image is overwhelming. The court's instructions were not a barrier against the jury believing that the psychopathic murderer's state of mind exemplified defendant's own state of mind.

There is another latent but invidious aspect to the trial court's handling of that evidence. The court's limiting instructions were grossly inadequate to guide the jury and protect defendant. The trial court explained to the jury that it had viewed the film, yet it did not ask if any jurors had seen the film and it failed to instruct the jurors not to see it. The court informed the jury as follows:

> What we did, well, what I did, frankly, I looked at the whole movie. And the reason I looked at the movie is because you will recall testimony from two different witnesses and I'm not suggesting whether you should believe it or not believe it, but you heard the testimony from two different witnesses that the defendant allegedly during the course of his discussion concerning this matter made reference to the girl screaming and the guy, as I recall exactly, the guy killing her or stabbing her to stop her from screaming. Well, and he said like in "10 to Midnight." * * * So I watched "10 to Midnight" to see if there was any place where there might be some indication that somebody was screaming and somebody got stabbed.

*See State v. R.W.,* 200 *N.J.Super.* 560, 568, 491 *A.*2d 1304 (App.Div.1985) (trial court's failure to instruct the jury not to watch television program on father-daughter incest in combination with two other serious, unrelated errors constituted reversible error in prosecution of defendant for sexual assault on daughter), *modified on other grounds,* 104 *N.J.* 14, 514 *A.*2d

1287 (1986). Further, because the prosecutor's application to show the film apparently postdated *voir dire,* jurors had not been questioned about whether they had seen it. Although there is no evidence that "10 to Midnight" was aired during the trial, curious jurors could have easily rented "10 to Midnight" and have been exposed to the potent message of the film. (The trial judge himself acknowledged the easy availability of the film. After viewing it at fast-forward speed, accompanied by the attorneys and court personnel, he quipped: "I've spoiled it for everyone. But I guess for ninety-nine cents at 7–11 you can rent it."). Moreover, there may have been jurors who had already seen the film. Thus, defense counsel in objecting to this evidence argued:

> [W]hen the name of the film was first mentioned to me I didn't realize that I had seen this movie before. Once I saw a brief portion of it I remembered the entire movie, what the entire movie was. And we may have jurors in the same situation that all they need to see is a brief portion and to remember the theory behind the entire film and I think that, too, would operate unjustly to the detriment of the defendant.

The trial court did nothing about the palpable risk of juror familiarity with the film. Astonishingly, the court seemed to have convinced itself that the segments themselves did not show "a sex maniac running about" and therefore the jury would not confuse defendant with the sex maniac featured in the film. With that assumption, the court rationalized that the probative value of the film substantially outweighed its prejudicial effect. However, it is clear that the film segments themselves showed "a sex maniac running about" committing multiple murders, and were profoundly and irretrievably prejudicial.

Further, if jurors viewed the actual film, they would have been exposed to its vivid and powerful messages: that psychopathic sexual killings can be grossly savage, that cunning criminals can take advantage of a criminal justice system laden with technicalities, and that true justice can be achieved only by

vigilante retribution, not by the criminal justice system.[1] There

_____

[1]The container of the videocassette version of the film contains the following description of "10 To Midnight":

> As the clock ticks 10 to midnight, you'll be riveted to your seat—here's an action-packed police thriller that's too close to real life for comfort! Take a clean-cut sex killer who uses legal loopholes to get away with murder, add a cop who does what he thinks is right, and "one side or the other, you're not apt to remain neutral!" (Archer Winsten, *New York Post*)
>
> *Charles Bronson* stars as Leo Kessler, a tough Los Angeles detective up against a cunning psycho (*Gene Davis*) whose genius for concocting alibis is surpassed only by the horror of his erotically stimulated crimes. But the killer makes a fatal mistake, choosing the cop's spunky daughter [ ...] as his number one target, and forcing Bronson to go man on man.
>
> The undisputed king of America's tough-guy heroes, Charles Bronson is supported by *Andrew Stevens* as his rookie partner and *Geoffrey Lewis* as the killer's cynical lawyer. *William Roberts'* script takes a hard look at the insanity laws in this country, and "the film is exceedingly well made" by master-of-suspense *J. Lee Thompson* [ ...]. *10 To Midnight*—see it before it's too late!

An independent viewing of the whole film reveals that it advocates vigilante justice as a response to an inadequate criminal justice system. In fact, the entire film is riddled with broadsides against the criminal justice system. Some of Bronson's more memorable harpoons are as follows: "The way the law protects those maggots out there, you'd think they're an endangered species"; "I remember when legal meant lawful, now it means some kind of loophole"; "If [the murderer's defense lawyer] gets defendant off he's won the Superbowl and to all the scum out there he's a hero."

Bronson freely flouts court and evidence rules, promoting gut instinct over due process. Specifically, Bronson fabricates incriminating evidence by surreptitiously procuring a blood sample from one of the victims and planting it on the murderer's clothes. When his scrupled partner, due to testify at the murderer's trial, learns of this fabrication, Bronson exhorts him to perjure himself ("You go in that courtroom and forget what's legal and do what's right.").

The film paints defense lawyers as seedy and unscrupulous. We see the murderer's counsel coaching him how to feign insanity. Indeed, at the end of the film, when the now ex-officer Bronson (he had been fired from the police force for fabricating evidence) has apprehended the murderer and the police are preparing to take the murderer away, the murderer cleverly recites the routine he learned from his lawyer.

The final scene is the grace note on the theme of vigilante justice. As the police are preparing to take him away, the murderer tells Bronson that he is sick and not in control of himself. He promises revenge on Bronson: "All you can do is lock me up, but not forever. One day I'll get out. That's the law.

is no way to be confident that those messages may not have been brought to bear on the deliberating jury, *i.e.*, if the jury did not vote to convict and sentence to death, defendant would be free to kill again. It is the type of suggestion that should not be communicated to a jury in the trial of a capital-murder case. *See, e.g., State v. Koedatich*, 112 *N.J.* 225, 323–25, 548 *A.*2d 939 (1988). Further, the lurid, violent images from the film would not be easily erased from the minds of the jurors. In essence, the film itself is so bloody and gruesome and its message so inconsistent with the law applicable to the case that it could completely mislead the jury and blot out its ability to deliberate.

Still, the State, with this Court's concurrence, contends that any error in the admission of the film segments was harmless because of the overwhelming evidence of guilt. Such an argument overlooks the fact that absent the showing of the film, the jury might well have found that defendant's conduct indicated something less than purposeful murder. For example, the jury might have found that during the course of an attempted robbery, defendant had struck the victim out of panic or fear of being identified. Once he realized she was dead or dying, he panicked further and disposed of her body in a creek. Even if this Court is uncertain about the admissibility of the film, this is a capital case in which concerns for procedural protections intensify and the need to resolve uncertainties in favor of the defense becomes commanding. *State v. Bey*, 112 *N.J.* 45, 548 *A.*2d 846 (1988) (*Bey* I). The level of solicitude demanded in a capital prosecution tips the balance.

Moreover, the prejudicially harmful effect of the error is not conjectural. During the sentencing phase, for example, the jury found the presence of the c(4)(c) aggravating factor, which includes depravity of mind. It is quite likely that the viewing

---

And I'll be back. You'll hear from me ... you and the whole fucking world!" Coolly responding "No we won't," Bronson shoots him through the forehead.

of the film contributed to its finding because the prosecutor, appreciating the impact of the film, expressly tied the segments to the (c)(4)(c) aggravating factor:

> And if we talk about a depraved mind, let's finally go to the issue of the movie that he described. Can you believe this man was so overwrought with guilt that he should find at the feet of this jury compassion and mercy when he proceeds to describe to the police what you saw in this courtroom? That is, his ability to describe a movie that he had seen and was helping the police understand how the victim was screaming before he killed her? Is that depravity? I submit to you, ladies and gentlemen, that this case reeks of the defendant's depraved mind. And the foul stench of what he did goes far beyond driving a spike in someone's head, because it shows what was going on in his mind at the time.... And he proceeds to help the cops by saying: look, there's a movie, if you've seen it. Here's what happens: some guy kills a couple of girls and this is what they're doing, they're screaming, so forth. You saw that. The evidence of that movie was presented not to get you to believe in any way what you were seeing meant he was guilty of murder, but it was offered even more importantly at this point to show his state of mind. That evidence was highly relevant and important in the guilt phase of the trial, but it's even more so now, because now he's explaining to you in a way that you can see in this courtroom the kind of things that he was thinking of and the kind of mind that this man had when he committed the acts that you've already said he's done beyond a reasonable doubt.

It is clear that the prosecutor relied on the film segments solely for the purpose of arousing the passion of the jury to a level that would impel it to impose a death sentence. It is equally clear that he succeeded. *See State v. Poe,* 21 *Utah* 2d 113, 441 *P.*2d 512 (1968) (trial court abused its discretion by permitting jury to see gruesome color slides of autopsy of victim when all the material facts that could have been adduced by viewing the slides had been established by uncontradicted testimony; showing the slides served the sole purpose of arousing passions of jury "so that they would not recommend life imprisonment"). It cannot be assumed that that evidence did not have a similar impact on the jury's deliberations on criminal guilt.

One final issue, not raised by defendant, relates to the prejudicial impact of the film on the jury's deliberation on the aggravated-criminal-sexual-contact charge. The State adduced marginal evidence on that charge. Viewing the film excerpts

surely would have imported vivid, prejudicial images of sexual aggression into the jury's deliberations, injecting powerful suggestions of sexual depravity into the case. Images of nude murders, conveying the notion of sexual attack, might well have persuaded the jury to find aggravated sexual contact on otherwise borderline facts. (The film itself makes the point directly—the murders are sexually motivated. As Bronson, who plays the detective in the movie assigned to the case, theorizes: the murderer uses a knife as a penis.) The State's reference to and reliance on the film confirms its prejudicial and harmful effect with respect to the sexual-contact charge.

Beyond question the probative worth of the film segments was minimal, its capacity to prejudice and confuse overwhelming. The decision between life and death, as well as the determination of criminal guilt, might have hinged on the admission of the film. I would reverse defendant's convictions of murder and sexual contact because the trial court erred by failing to exclude the film excerpts.

### III.

The Court acknowledges that defendant's conviction does not establish death eligibility, as the trial court failed to properly charge the jury on capital murder under *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988). *Ante* at 228, 250–255, 593 *A.*2d at 268, 279–281. I agree with the Court's reasoning on this issue. I disagree, however, that the Court, as requested by the State, can simply mold defendant's conviction to one of non-capital murder. *Ante* at 228, 593 *A.*2d at 268. As I have explained elsewhere, we cannot be certain that had the jury been given a full and proper charge on murder that included and clearly differentiated between capital and non-capital murder, it would have rejected a determination of guilt with respect to both and have found that a lesser form of homicide had been established in the evidence. *State v. Perry,* 124 *N.J.* 128, 192, 590 *A.*2d 624 (1991) (Handler, J., concurring in part and dissenting in part);

*State v. Hunt, supra,* 115 *N.J.* at 407, 409–10, 558 *A.*2d 1259 (Handler, J., dissenting). Further, because of its disposition of the case on this issue, the Court fails to reach issues relating to the sentencing phase of defendant's trial. Those issues, arising from the State's notice of aggravating factors and its decision to prosecute this matter as a capital case in the face of inadequate evidence of aggravating factors, implicate fundamental fairness and due process concerns, and as such, warrant additional comment.

### A.

In *State v. McCrary,* 97 *N.J.* 132, 478 *A.*2d 339 (1984), this Court sanctioned pretrial judicial review of the sufficiency of evidence supporting aggravating factors that the State proposes to prove during a sentencing proceeding. The allegation of aggravating factors has "momentous effects. Without notice and proof of an aggravating factor, there can be no death penalty." *Id.* at 140, 478 *A.*2d 339.

At pretrial proceedings in this case the trial court refused to conduct a *McCrary* hearing to determine the adequacy of evidence supporting aggravating factor c(4)(c). It ruled that such a hearing was obviated because there were other aggravating factors, c(4)(f) and (g), that were not challenged, and presumably would remain in the case.

*State v. Spotwood,* 202 *N.J.Super.* 532, 495 *A.*2d 483 (Law Div.1984), directly addressed the question raised here, namely, whether a defendant is entitled to a pretrial hearing to challenge the sufficiency of any aggravating factors as long as there is another aggravating factor that is not challenged. In *Spotwood,* the State gave notice that it intended to establish two aggravating factors to support a death sentence. The defendant moved to dismiss one of the two aggravating factors. The court rejected the defendant's request, stating that *McCrary* dealt with a situation in which the defendant sought dismissal of *both* aggravating factors alleged by the prosecu-

tor. In that situation, the court reasoned, dismissal of both factors "would dispose of the need for a death-qualified jury and a separate sentencing hearing, and would free defendant from the specter of the death penalty." 202 *N.J.Super.* at 534, 495 *A.*2d 483. The court contrasted that situation with the one before it, declaring that the existence of one unchallenged aggravating factor would, in any event, require the case to proceed as a capital one and, hence, a pretrial hearing to challenge another aggravating factor would be "a needless exercise of judicial action." *Ibid.* It noted further that if the defendant were to be convicted, he could then move to dismiss the remaining aggravating factor prior to the penalty phase. *Ibid.*

Evidently, the court in *Spotwood* believed that the exclusive "need" served by a *McCrary* hearing is to determine only whether the State will seek the death sentence. Concededly, the important concern that is addressed by the *McCrary* proceeding is whether the prosecution should go forward as a *capital* case. But the *McCrary* proceeding also necessarily determines *how* a capital case should go forward. Hence, the concerns inevitably implicated by a *McCrary* hearing are both *whether* and *how* a prosecution is to be presented as a *capital* case.

There can be no question that the presence of an aggravating factor can affect the course and content of jury *voir dire,* as well as the trial itself in both its guilt and penalty phases. *See State v. McCrary, supra,* 97 *N.J.* at 141, 478 *A.*2d 339. Aggravating factors are based on evidence that frequently is admitted in the guilt phase of the trial. Hence, it is extremely important for defense counsel to know what evidence is likely to be introduced and how likely it is that evidence will be found sufficient to support not only an aggravating factor in the subsequent penalty trial but, as well, a determination of guilt in the criminal trial. *See, e.g., State v. Marshall, supra,* 123 *N.J.* at 240–42, 586 *A.*2d 85 (Handler, J., dissenting). For example, preparatory to jury selection, knowing whether a jury harbors

feelings of bias or prejudice with respect to circumstances that can be relevant to guilt as well as sentencing, *i.e.*, if the defendant has a prior murder conviction, *e.g.*, *State v. Pennington*, 119 *N.J.* 547, 575 *A.*2d 816 (1990); or if the defendant has committed other crimes, *e.g.*, *State v. Long*, 119 *N.J.* 439, 575 *A.*2d 435 (1990); or if the defendant committed a sexual assault on his victim, *e.g.*, *State v. Zola*, 112 *N.J.* 384, 548 *A.*2d 1022 (1988); *State v. Williams II, supra*, 113 *N.J.* 393, 550 *A.*2d 1172, or if the victim was particularly vulnerable because of his or her status or condition, *e.g.*, *State v. (Samuel) Moore, supra*, 122 *N.J.* at 446–51, 585 *A.*2d 864, may all be critical. Moreover, virtually identical evidence may be applied differently with respect to guilt and sentence. *See, e.g., State v. Pennington, supra*, 119 *N.J.* 547, 575 *A.*2d 816 (in capital prosecution, prior murder conviction that can be used as an aggravating factor in penalty phase of trial can be used to affect credibility in guilt phase). Thus, a defendant's strategy may be substantially influenced by whether evidence that bears on both the issues of guilt and penalty should or will be used in both phases of the trial. *See State v. Pitts*, 116 *N.J.* 580, 562 *A.*2d 1320 (1989) (psychiatric evidence that was not admissible in guilt phase could be used as mitigating evidence in penalty phase); *cf. State v. Marshall, supra*, 123 *N.J.* 1, 586 *A.*2d 85 (evidence of good character and reputation bearing on motive in guilt phase also relevant to mitigating factor in sentencing phase). Furthermore, the trial court itself, in determining admissibility of evidence, may be required under *Evidence Rule* 4 to engage in a more complex and delicate balancing of probative worth and prejudicial potential when evidence does double duty with respect to both the issues of guilt and penalty. *State v. Clausell, supra*, 121 *N.J.* 298, 580 *A.*2d 221. Thus, the elimination of any possible use of such evidence as an aggravating factor for sentencing purposes can fundamentally alter defense strategy as well as the court's conduct of the trial.

Fairness concerns for the defendant must, of course, dictate the proper procedural course in a capital cause. The bifurcat-

ed-trial system necessarily means that the same jurors who must determine the defendant's guilt or innocence will, on the return of a verdict of guilty of capital murder, also determine whether the defendant lives or dies. Thus, from the outset of the case, defense counsel must formulate a trial strategy with the sentencing phase in mind. Even before *voir dire* begins, counsel must plan to defend against the aggravating factors that may be submitted at the sentencing phase. As one commentator has noted,

> it is reasonable to assume that the experience of hearing trial evidence and deciding on the guilt of the defendant will influence penalty phase decision making. Certainly the possibility of such influence controls trial strategy.
>
> \* \* \* \* \* \* \* \*
>
> [C]apital jurors begin the penalty phase with a story developed during the guilt phase. . . . [O]nce the story has been developed, jurors are likely to resist reconstruction of it. Hence, the guilt phase and penalty phase are necessarily interdependent, pointing to the need for integrated trial phase and penalty phase strategies. [Hans, "Death by Jury," in *Challenging Capital Punishment* 149, 158, 162 (K. Haas & J. Inciardi, eds., 1988).]

Given the overwhelming burden of preparing a defense in a capital case, see Goodpaster, *The Adversary System, Advocacy, and Effective Assistance of Counsel in Criminal Cases*, 14 *N.Y.U.Rev.L. & Soc. Change* 59 (1986), defense counsel should not be saddled with the additional burden of defending against aggravating factors that might have been dismissed at a pretrial hearing. Counsel must, at a *McCrary* hearing before trial, have the opportunity to challenge the sufficiency of the evidence of *any* aggravating factor, for that factor may substantially affect the course and conduct of the entire trial.

It may be, as *McCrary* notes, that, in contrast to the California capital-murder statute, the New Jersey capital-murder practice does not require that aggravating factors be charged in an indictment or "accusatory pleading." *McCrary*, 97 *N.J.* at 145, 478 *A.*2d 339. That distinction, however, does not bear on whether the availability to a capital defendant of a full pretrial hearing on the evidentiary sufficiency of aggravating factors is essential. Even though aggravating factors need not be

presented to or found by a grand jury, formal pretrial notice of aggravating factors is absolutely essential as a matter of fundamental fairness and due process. *See N.J.S.A.* 2C:11–3(c)(2)(e); *R.* 3:13–4(a). Hence, whether such aggravating factors must be included in the original accusation or indictment or only in a notice before trial, the reasons that entitle a defendant to challenge such factors are equally compelling. *Cf. Richards v. Superior Court,* 146 *Cal.App.*3d 306, 194 *Cal.Rptr.* 120 (1983) ("California permits pretrial challenges to unsupportable 'special circumstances' used to justify the imposition of the death penalty, even when unchallenged 'special circumstances' remain."), *rev'd on other grounds, People v. Morales,* 48 *Cal.*3d 527, 257 *Cal.Rptr.* 64, 770 *P.*2d 244 (1989).

Moreover, *Spotwood* fails wholly to accommodate our strong policy to avoid the unfairness and mischief that is wrought by overcharging. *E.g., State v. Christener,* 71 *N.J.* 55, 362 *A.*2d 1153 (1976). That type of error has even more foreboding prejudicial consequences in the context of a capital-murder prosecution. *See, e.g., State v. Rose, supra,* 112 *N.J.* at 553, 548 *A.*2d 1058 (Handler, J., dissenting). Aggravating factors, which bear the basic characteristics of substantive criminal offenses, convert ordinary murder prosecutions into capital-murder trials. They inflate enormously the gravity of the crime that confronts the defendant. *State v. Spotwood, supra,* 202 *N.J.Super.* at 534, 495 *A.*2d 483. That prior to the commencement of the guilt-phase trial the jury will become aware that the State intends to establish the existence of aggravating factors, inevitably conditioning the jury to believe that the case is extremely grave, a *capital* case, is obvious. The more aggravating factors that are invoked, the more pervasive and persistent will be the impression of jurors with respect to the extreme gravity of the charges, greatly increasing the prosecutorial risks faced by the defendant. We have recognized a trial court's obligation, on the defendant's request, to question jurors in *voir dire* about their ability to weigh evidence fairly in light of aggravating factors present in the case. *Williams* II,

*supra*, 113 *N.J.* at 417, 550 *A*.2d 1172 ("the trial court's refusal to allow questions that might provide important insight into any juror's attitude concerning a rape accompanying a murder constitutes serious error"). A successful challenge to an aggravating factor eliminates the need for the jury to be examined with respect to that aggravating factor. If the defendant can successfully eliminate the presence of *any* aggravating factors before the initiation of the guilt trial, he or she should be given the opportunity to do so.

Moreover, the failure to permit a defendant to challenge aggravating factors can have very concrete and practical detrimental effects. Here, for example, although two aggravating factors, (c)(4)(f) and (g)), remained unchallenged, those factors were effectively removed from the case when the jury acquitted defendant of robbery. See discussion *infra* at 252–260, 593 *A*.2d at 280–284. Indeed, aggravating factor c(4)(g) was not even submitted to the jury. Thus, had defendant successfully been able to challenge the c(4)(c) aggravating factor, the case might not have been prosecuted or continued as a capital prosecution.

Further, even though the case from its inception was prosecuted as a capital cause, there is a possibility that the jury might not have reached the same guilt determinations with respect to the several crimes charged had defendant been able to remove the c(4)(c) factor from the trial. Although the jury was not formally instructed with respect to aggravating factors until after the guilt-phase verdict, the jury embarked on the guilt trial and entered into its deliberations of guilt with the distinct understanding that if the defendant were found guilty of capital murder, it would be expected and required to consider the evidence bearing on the appropriateness of the death penalty, and that its determination would involve consideration of aggravating factors. Thus, the jury surely sensed that the State believed that the case was a capital case and that a jury could reasonably conclude that defendant deserved to die for his crime, and that there was sufficient evidence of aggravating

factors to justify the death sentence. In this context, to conclude there was no danger that the jury would compromise its determination of guilt because of the presence of potential aggravating factors, simply because it would not be instructed on aggravating factors or required to determine this existence until the penalty phase of the case, is unrealistic.

In short, the reasons impliedly accepted by the Court for denying a *McCrary* hearing on challenged aggravating factors are insubstantial and unpersuasive. Those reasons are surely outweighed by considerations of fundamental fairness, which call for such a hearing.

### B.

Further, fundamental fairness and due-process concerns are implicated in the State's submission of the c(4)(f) aggravating factor in the penalty-phase of the trial as well as the majority's suggestion that the c(4)(g) factor may have been validly submitted had felony murder based on attempted aggravated sexual contact been charged *sua sponte*. The State charged defendant in the indictment with the separate offenses of aggravated criminal sexual contact and robbery. The State also charged defendant with felony murder, for which the predicate felony was robbery. Robbery under *N.J.S.A.* 2C:51–1 is enumerated by the New Jersey Code of Criminal Justice (Code) as a felony and can, as in this case, be charged as a predicate felony. *See* 2C:11–3a(3). Aggravated criminal sexual contact (which is a sexual offense that does not involve penetration), *N.J.S.A.* 2C:14–3a, is not enumerated as a felony under the Code, and hence cannot constitute a predicate felony for felony murder. The jury acquitted defendant of robbery and felony murder. However, it convicted defendant of aggravated criminal sexual contact. On appeal, defendant, understanding that aggravated criminal sexual contact is *not* a felony, argues that the evidence that supported his conviction for aggravated criminal sexual contact would also support the offense of attempted aggrava-

ted sexual assault (*i.e.*, an attempt to commit a sexual assault involving penetration). Hence, defendant contends that because aggravated sexual assault *is* a felony under the Code and the "attempt" to commit a crime is considered the equivalent of the crime, the court should have charged *sua sponte* felony murder on the basis of attempted aggravated sexual assault.

Whether the court in these circumstances should have charged the crime of felony murder based on the predicate offense of attempted sexual assault poses a difficult and delicate problem. To have done so would have been consistent with our policy that all forms of homicide rationally supported by the evidence, whether they be lesser-included or alternative offenses, should be placed before the jury. *See, e.g., State v. Grunow*, 102 *N.J.* 133, 506 *A.*2d 708 (1986). That policy assumes even greater significance in the context of a capital-murder prosecution. *See State v. Rose, supra*, 112 *N.J.* at 552–54, 548 *A.*2d 1058 (Handler, J., dissenting). The Court, nevertheless, rejects defendant's claim, implying that to allow such a charge would be unfair to defendant. Its theory of "unfairness" is problematic.

> What if the jury had convicted defendant of intentional murder and then had premised a sentence of death on this attempted sexual penetration, viewed as an aggravating factor? We could well envision that if the court on its own motion had submitted this felony to the jury and the jury had not only found attempted sexual penetration but predicated a death sentence on it, what a troublesome issue it would be to review on appeal. [*Ante* at 256, 593 *A.*2d at 282.]

The Court seems to suggest that in order to be fairly tried for criminal guilt based on a new charge of felony murder, defendant would be unfairly exposed to the death penalty. I cannot believe, however, that defendant's entitlement to a complete charge on all offenses that are rationally supported by the evidence could, in effect, require an election on whether or not to face the death penalty.

Aside from the merits of defendant's underlying claim on this point, the problem with the Court's view is that it assumes that a jury might have validly based a death sentence on attempted

sexual penetration. I disagree because in the absence of such an offense being specifically included in the State's formal notice of aggravating factors, that offense may not be used by the State to obtain a sentence of death.

*N.J.S.A.* 2C:11–3(c)(2)(e) and *Rule* 3:13–4(a) require that the State give the defendant notice of the aggravating factors the State will seek to prove at sentencing. *See State v. McCrary, supra,* 97 *N.J.* 132, 478 *A.*2d 339. This is a strict requirement that cannot be circumvented; it allows a defendant adequately to prepare a defense and craft trial strategy that may save his or her life. See discussion *supra* at 247–253, 593 *A.*2d at 278–281.

The c(4)(f) aggravating factor requires the State to prove that defendant committed a murder in order to escape detection from or apprehension for an underlying *offense.* Here, the State expressly relied on *robbery* as the underlying offense; indeed, defendant obtained an interlocutory Appellate Division order requiring the State to specify the offense that was the basis of the c(4)(f) factor. Subsequently, at a pretrial hearing, the prosecutor specified to the trial court that the State would rely on robbery:

MR. KLEIN (DEFENSE COUNSEL): [T]he statute refers to a homicide that was committed for the purpose of avoiding detection as to another offense.

THE COURT: Well, all right. So, I—

Mr. KLEIN: The question is what is the other offense?

THE COURT: Robbery.

MR. KLEIN: You answered that but the prosecutor hasn't, your Honor.

THE COURT: [O]nly robbery is alleged as a predicate felony under the statute. Isn't that your intention, robbery, is it? Isn't it?

MR. WIXTED (THE PROSECUTOR): Yes, your Honor.

THE COURT: That couldn't be clearer.

MR. KLEIN: It's clearer because he said it on the record.

\* \* \* \* \* \* \* \*

THE COURT: ... I saw immediately that the offense which he was alleging your client was endeavoring to avoid by way of his actions was that of robbery.

\* \* \* \* \* \* \* \*

THE COURT: I find both factually, legally and in compliance with [the Appellate Division's] direction and my order that the prosecutor has responded saying the offense is robbery.

The jury, it cannot be overemphasized, acquitted defendant of robbery, and the derivative offense of felony murder. Nevertheless, at the sentencing phase, the prosecutor argued that defendant's conviction for aggravated sexual contact could be substituted for robbery and used to support the c(4)(f) factor. The trial court agreed with the prosecutor, and ultimately the jury concluded that c(4)(f), based on aggravated sexual contact as an "offense," had been established and was of sufficient weight to justify the imposition of the death sentence.

Due process requires that the State specify the offense on which it intends to rely in submitting the c(4)(f) factor with enough specificity so that the defendant can prepare to meet and defend himself against the State's allegations. See *State v. Coyle*, 119 *N.J.* 194, 238, 574 *A.*2d 951 (1990) ("Because of the stakes involved in a capital case, [this Court] compel[s] the State to offer all its proofs of any applicable aggravating factor against the defendant at his or her first trial.") (quoting *State v. Biegenwald*, 110 *N.J.* 521, 541, 542 *A.*2d 442 (1988)); *New Jersey Parole Bd. v. Byrne*, 93 *N.J.* 192, 209, 460 *A.*2d 103 (1983) ("Due process is flexible and calls for such procedural protections as the particular situation demands."). In this case, the State did in fact specifically charge robbery both as a substantive offense in the indictment and the "offense" constituting the aggravating factor of c(4)(f). It offers no sensible reason why it should be permitted to depart from the requirement of actual notice and belatedly use another, uncharged offense to secure a death sentence.

The prosecutor could have alleged more than one predicate offense for the c(4)(f) factor, but failed to do so. Although there was evidence adduced relating to sexual offenses, the State chose not to rely on that evidence to support the c(4)(f) factor. Moreover, there is nothing to suggest that there was any surprise visited on the prosecution as a result of unantic-

ipated trial developments that generated new evidence of a sexual offense not previously revealed to the State in the course of its investigation. Further, there is no suggestion that defendant induced the State to commit to a particular theory and later introduced new evidence. Thus, all of the evidence was available to and fully anticipated by the State at the time it formally stated that it would rely on robbery as the underlying offense to c(4)(f). In response to defendant's proper request for specificity in order to prepare his defense, the State specified the underlying offense of robbery for the c(4)(f) aggravating factor. The State cannot alter its theory because it discerns a strategically more advantageous view of the same evidence. It cannot simply blindside a defendant by switching theories when the first one fails.

In sum, the jury could not have found the c(4)(f) factor. Robbery was eliminated as a predicate offense, and neither aggravated criminal sexual contact nor attempted aggravated sexual assault (penetration) was charged as a predicate offense in the formal notice of aggravating factors.

Similar, if not more compelling, reasons would invalidate any attempt by the State to revive the c(4)(g) factor. That factor aggravates a murder committed in the course of certain enumerated felonies, including sexual assault and robbery, or the attempt to commit such a felony. The c(4)(g) factor was not submitted to the jury because the State had relied on robbery as the predicate felony in its notice of aggravating factors, and defendant was acquitted of robbery. (Recall that the majority suggested that had the trial court *sua sponte* charged felony murder based on attempted sexual assault (penetration), the substantive offense of attempted sexual assault may have triggered an aggravating factor in the penalty phase; the majority thus implied that attempted sexual assault could have served as a predicate felony to the c(4)(g) factor, even though that factor had been dropped by the State after defendant was acquitted of robbery—the felony on which the State relied pursuant to the notice of aggravating factors). The State, as

indicated, did not include any sexual offense as a basis for any aggravating factor. More significantly, the defendant was not charged with the substantive crime of sexual assault or attempted sexual assault. The State, I submit, may never base an aggravating factor on a substantive crime or felony for which a defendant has not been charged and convicted in the trial to determine criminal guilt.

In no capital case that we have reviewed since the reimposition of the death penalty has the State submitted the c(4)(g) factor without defendant having been indicted for and convicted of the underlying felony. See, *e.g.*, *State v. (Samuel) Moore*, *supra*, 122 *N.J.* 420, 585 *A.2d* 864; *State v. McDougald*, 120 *N.J.* 523, 577 *A.2d* 419 (1990); *State v. Hightower*, 120 *N.J.* 378, 577 *A.2d* 99 (1990); *State v. Gerald*, 113 *N.J.* 40, 549 *A.2d* 792 (1988); *State v. Bey* II, 112 *N.J.* 123, 548 *A.2d* 887 (1988); *State v. Bey* I, *supra*, 112 *N.J.* 45, 548 *A.2d* 846. That is so because in order to be found guilty of felony murder, one need have only the intent to commit the underlying felony; that intent suffices to establish guilt of both the felony and the murder. In contrast, for the c(4)(g) factor to be found, the defendant will have already been convicted of capital murder. Hence, the defendant must have formulated *both* the intent to commit knowing or purposeful murder *and* the intent to commit the underlying felony. *See State v. Ramseur, supra*, 106 *N.J.* at 189 n. 2, 524 *A.2d* 188 (distinguishing the c(4)(g) factor from the felony-murder doctrine, and emphasizing that those convicted only of felony murder, but not purposeful murder, will not be subjected to the death penalty). The c(4)(g) factor involves "two separate and distinct culpabilities with conduct constituting two separate crimes." *See Brewer v. State*, 275 *Ind.* 338, 417 *N.E.2d* 889, 911 (1981) (Debruler, J., dissenting and concurring) (discussing Indiana's analogous aggravating factor). Permitting the State to submit aggravating factor c(4)(g) in the absence of an indictment for the underlying or predicate crime, in effect, allows the defendant to be tried for and found guilty of a crime for which he has not been charged. *See N.J. Const.*,

art. I, para. 8 ("No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury....."). That is clearly impermissible.

It also is violative of fundamental fairness. The determination that a defendant is subject to an aggravating factor involving a statutory felony is tantamount to the determination that defendant has committed that substantive crime. See *State v. Ramseur, supra,* 106 *N.J.* 123, 524 *A.*2d 188. The failure to indict for the underlying felony deprives the jury of the opportunity formally to focus its deliberations on culpability alone. It denies defendant the basic right to have the jury determine independently guilt or innocence on that charge apart from its consideration of other charged crimes, and, more importantly, apart from its consideration of the death sentence. The State should not be allowed to withhold the charge of the substantive criminal offense when that offense also constitutes the basis for an aggravating factor and arises out of the same criminal event and is supported by the same evidence. *Cf. State v. Gregory,* 66 *N.J.* 510, 333 *A.*2d 257 (1975) (State must avoid fractionalizing prosecution).

Predicating the c(4)(g) factor on an unindicted felony also implicates the concerns of double jeopardy. We have recognized that aggravating factors shadow criminal guilt. Determination of aggravating factors can trigger double jeopardy. See *State v. Biegenwald,* 106 *N.J.* 13, 68–72, 524 *A.*2d 130 (1987). The converse also obtains. Surely, as occurred in this case with respect to robbery, if a defendant has been tried and acquitted of the underlying felony, he or she could not later be subjected to punishment based on that felony. Without a jury determination of guilt of an underlying felony as a substantive crime, a defendant may be deprived of an acquittal. He is also deprived of the opportunity to have the jury consider the felony as a basis for felony murder, and possibly a determination of guilt of non-capital murder. See discussion, *supra* at 253–255, 593 *A.*2d at 280–281. If the State is not required to charge each substantive felony as a crime, a defendant may well be whip-

sawed. Thus, because a finding of the c(4)(g) factor requires that the jury ascertain defendant's guilt of the underlying felony or offense beyond a reasonable doubt, defendant is effectively subject to punishment for a felony that the State has chosen not to prosecute as a crime.

The State will enjoy a greater tactical advantage by using the unindicted felony as the basis for an aggravating factor. Even though defendant will have already been found guilty of capital murder, this procedure enables the jury to consider defendant's guilt of the felony at the same time it is determining whether he deserves to die. I cannot envisage a procedure that would be more unfair to a criminal defendant. *See Furman v. Georgia*, 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972); *State v. Ramseur, supra*, 106 *N.J.* at 382–404, 524 *A.*2d 188 (Handler, J., dissenting).

Thus, when a felony constitutes a predicate of an aggravating factor, the trial court should be required to charge the jury clearly that it could base a finding of that factor only on a felony for which the defendant was *convicted*. The Court's portentous dictum, *ante* at 256, 593 *A.*2d at 282, suggesting that an aggravating factor could be found on the basis of a felony not specified in the State's notice of aggravating factors, or for which defendant has not been convicted, is troublesome to say the least. In this case, the State, knowing at the outset that there was evidence to support aggravating factor c(4)(g), lost its opportunity to submit that factor based on aggravated sexual assault by not indicting defendant for that crime and not giving defendant notice prior to trial. The State could not decide to submit the factor at the end of the trial, simply on the basis of the court's *sua sponte* charge on felony murder encompassing the sexual offense.

In sum, the prosecutor was permitted to argue the existence of c(4)(f) based on aggravated criminal sexual contact, with undeniable prejudicial consequences. That factor was invalidly submitted to the jury. There was a distinct possibility that the

evidence on which to submit the c(4)(c) factor could have been shown to be insufficient. Further, the State dropped the c(4)(g) factor when defendant was acquitted of robbery. Consequently, without a remaining valid aggravating factor, there is a strong likelihood that the case would have been rendered non-capital.

## IV.

For the reasons expressed, I dissent in part and concur in part with the Court's opinion.

*For affirmance in part; for reversal in part* —Chief Justice WILENTZ, and JUSTICES CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN–6.

*For reversal*—Justice HANDLER–1.